JOHN R. GARDNER and others, appellants,

and

HENRY V. BUTLER and others, respondents.

1. A director of a corporation cannot make with himself, or for his own benefit, a contract which will bind the company. The contract may be repudiated by the company, at the instance of a stockholder.

Gardner *v.* Butler.

2. If directors are employed in the business of the company, and agree to pay themselves a stipulated sum, the agreement is void, and no recovery can be based upon such contract, but for such services as they render they can recover upon the *quantum meruit.*

*Mr. George De Forest Lord,* of New York city, and *Mr. Cortlandt Parker,* for appellants.

*Mr. T. N. McCarter* and *Mr. F. T. Frelinghuysen,* for respondents.

On appeal from a decree of the chancellor, founded on the following opinion :

THE CHANCELLOR.

It appears, from the pleadings and evidence in the cause, that for many years previous to the 31st of August, 1852, Henry V. Butler, of Paterson, and Robert L. Taylor, of the city of New York, his brother-in-law, had been in business together in the manufacture and sale of paper, under the firm of H. V. Butler & Co. They entered into articles of copartnership on or about the day above mentioned, by which, after reciting their copartnership together up to that time, they entered into copartnership with each other in the same business, and under the same firm, for five years from the 1st of July, 1852. The articles provided, among other things, that they should be equally interested in the profits and losses, and that Butler should have the general management, direction and control of the business, subject, at all times, to the superintendence and inspection of Taylor, who might, at any time, at his option, exercise joint power in relation to the business, and that during all the time that Butler should have and take the management and control, he was to be entitled to and to receive a salary of $5,000 per annum, payable quarter-yearly, which should be charged to and borne by the copartnership; and he was thereby bound to devote his whole time and attention, and

give his entire exertions to the advancement of the business.
The business was carried on under these articles until the
1st of June, 1858, when the parties entered into a new
agreement, with similar provisions, for a continuance of the
copartnership for five years from that time. In 1862 they
obtained an act of incorporation from the legislature of this
state, by which they and the survivor of them, and their or
his associates, their successors and assigns, were constituted
a body politic and corporate, by the name of "The Ivanhoe
Manufacturing Company," to carry on the same business.
By the act it was provided that the capital stock should
be $450,000, with liberty to increase it to $600,000, the
shares to be $100 each. The company was not organized
under this act until after a supplement had been passed,
reducing the amount of the capital stock to $300,000, with
liberty to increase it to $600,000. The company was organ-
ized in March, 1866. The supplement was passed in Feb-
ruary of that year. By agreement between Butler and
Taylor, the former was entitled to subscribe for, and hold
twenty shares of the stock of the company more than the
latter. It was intended by both thus to give Butler & Co.
the control of the management of the company. He sub-
scribed for fifteen hundred and five shares, Taylor for four-
teen hundred and ninety shares, Aaron S. Pennington and
E. Boudinot Colt for two shares each, and Andrew Derrom
for one share. The five shares subscribed for by Messrs.
Pennington, Colt and Derrom were paid for by Mr. Butler.
Those gentlemen, with Messrs. Butler and Taylor, were
named in the act as the first directors of the company. On
the organization of the company, at the first meeting of the
board of directors, Mr. Henry V. Butler was elected presi-
dent. The powers of the president were then defined by
resolution to be—to manage and conduct all the manufac-
turing, mercantile and other business of the corporation, as
in his judgment should appear to be for the best interest of
the stockholders, and to appoint all such superintendents,
managers and employes as he might deem proper, and at

such salaries as he might deem proper, for conducting the business. On the 12th of July, 1867, the company issued one thousand additional shares of the capital stock, of which Butler and Taylor each took one-half. From the time of the organization of the company the business of buying material for manufacturing paper for its use, and selling its manufactured paper, was transacted by Henry V. Butler. It appears that Taylor never took any active part in the business, either before or after the incorporation. For all his services to the company, Mr. Butler, up to the time of Mr. Taylor's failure in business, drew (but without special authority to do so), as president, the same compensation, $5,000, which he had received from the firm of H. V. Butler & Co. On or about the 24th of October, 1867, Mr. Taylor failed in business, and on that day he made an assignment of all his property for the equal benefit of his creditors, accordingly, to the complainants. At a meeting of the board of directors of the company, held on the 23d of January, 1868, Mr. Butler stated that he had taken his son, Henry V. Butler, Jr., into copartnership with him in the paper commission business, in the city of New York, under the firm of H. V. Butler & Son, and proposed thereafter to transact the business of the company for such commissions as might be deemed fair and just; that he had consulted with gentlemen of experience in the city of New York, and in accordance with their views, proposed to make all the purchases, disbursements and sales for the company, for a commission of six per cent. on the gross amount of sales, the arrangement to begin on the 1st of February then next, and to continue for three years. The proposition was then accepted by a unanimous vote of the board. At a meeting of the board held on the 25th of May, 1868, it was resolved that from and after the 1st day of January, 1868, the salary of the president should be at the rate of $6,000 a year, and that the charge of $5,000 a year previous to that time be approved. Under the arrangement made at the meeting of January 23d, 1868, the firm of H. V. Butler & Son purchased

the materials and made the disbursements and sales up to the 1st of April, 1871, receiving therefor the stipulated commission of six per cent. on the amount of the gross sales. On the 29th of March, 1871, at a meeting of the board of directors then held, Mr. Butler, the president, communicated to the board, that a new firm had been formed (the firm of H. V. Butler & Son having been dissolved) for the transaction of the paper commission business in New York, under the name of H. V. Butler, Jr. & Co., and that that firm had submitted a proposition to make all the purchases, disbursements and sales for the company at a commission of six per cent. on the gross amount of the sales only. That proposition was then accepted and an arrangement made under it for one year. The firm of H. V. Butler, Jr. & Co. was composed of Henry V. Butler, Jr. & A. Gibbs Campbell, as general partners, and Henry V. Butler, Sr. was special partner therein. All of them were directors of the company, and the resolution was carried by their votes. Indeed, but one other director was present, E. Boudinot Colt. The bill in this cause was filed on the 20th of May, 1871. It prays that the arrangement for the payment of salaries to Henry V. Butler as president, and to Henry V. Butler, Jr., as superintendent of machinery of the company (he received $1,500 a year for that service), and the arrangements whereby the commissions were paid, may be set aside as fraudulent as against the complainants; that an account may be taken of the transactions of the company, and especially of the money paid for the salaries and commissions; that the defendant may be restrained from paying those salaries or commissions to Henry V. Butler or Henry V. Butler, Jr., or to any one else for their use or otherwise, and from making any contract for the sale of goods or purchase of materials on commission, and that the complainants, as assignees of Taylor, may have the benefit of the account, and may receive whatever is due them as stockholders. By an amendment to the bill, a prayer for a

Gardner *v.* Butler.

receiver, on the ground of the insolvency of the company, was added.

The defendants have all answered. Since the filing of the bill, Henry V. Butler has died.

That Henry V. Butler and Robert L. Taylor were copartners together in the paper business for many years; that the former had the entire management of the business, the latter giving to it, practically, no attention; that the two were the owners of all the stock of the corporation which succeeded the copartnership, and that it was agreed between them that in the corporation the former should have a majority of the stock to give him the control of its management, there is no question. After the organization of the company, and up to the time of Mr. Taylor's failure in business, and his consequent assignment of his property for the benefit of his creditors, Mr. Butler seems to have continued to superintend the business and to negotiate and conduct the sales and purchases therein, at the same compensation which he received for the same or like services under the copartnership. After the failure of Mr. Taylor he appears to have been unwilling to give his services to the business at the same rate of compensation as before, or rather, he seems to have been unwilling to render the same amount of service for the compensation which he received. His reason for it appears to have been that while he was willing to give to Taylor the benefit of the long-existing arrangement between them, he was not willing to continue it for the benefit of the creditors of the latter. It is insisted on the part of the complainants, that the express understanding and agreement between Butler and Taylor, on the exchange of the form of the business from that of a copartnership to the form of a corporation, was that they should continue to be equal in their participation in the benefits of the business. The proof of that agreement or understanding rests wholly on the testimony of Mr. Taylor, and it appears from his testimony that his memory had, when he testified, become so enfeebled by age as to be unreliable;

for, though the arrangement by which Mr. Butler received $5,000 a year for managing the business of the copartnership had existed, not only in their written articles of copartnership, but practically also from the 1st of August, 1852, to the time of the organization of the company, in 1866, Mr. Butler having, during all that period, had the management of the business and received that compensation for it under the agreement, Mr. Taylor appears to have wholly forgotten it. But Mr. Butler did, in fact, so transact the business after the organization of the company and give Mr. Taylor the benefit of his services in so doing in like manner as he had done under the copartnership, so long as it benefited Mr. Taylor personally; that is, until the latter failed in business and made an assignment for the benefit of his creditors. Indeed, it was not until January 23d, 1868, three months after the making of the assignment, that he made the arrangement by which he was to receive more compensation for his services as president, and other services, previously rendered by him without special compensation, were to be rendered by himself and others as a mercantile firm, for proper remuneration. During almost all the time that he himself rendered those services to the company, he and Taylor were the only persons interested in the company. They, together, owned all the capital stock.

Nor was he bound to render those services, by the obligations of his office of president. He was, indeed, as president, authorized to manage and conduct all the manufacturing, mercantile and other business of the corporation, and to that end was empowered to appoint such superintendents, managers and employes as he should think fit, and give to them such compensation as he might deem proper, but he was not thereby bound to undertake the sale of its goods or the purchase of its materials, to render to the company, in consideration of his salary of $5,000 or $6,000 a year, not only his services as president in the general oversight of its affairs, but also services in the sale of its goods and the purchase of materials for its manufactures, which

are sworn to have been worth, if performed by strangers, five times that amount. And though he had for years rendered those services, he might lawfully at any time have ceased from rendering them, if he saw fit, and have confined himself to what were strictly the duties of his office. Had the board, when he declined to buy and sell for the company without special compensation therefor, made the contracts which are now complained of, with a stranger, undoubtedly no question would have been made with regard to them.

But it is urged by the complainants that the resolutions under which the commissions were paid, were themselves entirely illegal; that, as was the fact, those who voted upon them were all either interested in the arrangement or else were mere representatives of those who were interested therein, and that, therefore, the principle enunciated in *Stewart* v. *Lehigh Valley R. R. Co.*, 9 *Vr.* 505, is applicable. It was held in that case that an express contract between the director of a corporation and his company, though not void, is voidable at the option of the *cestui que trust*, if exercised within a reasonable time, and that no consideration of its apparent or intrinsic fairness will induce a court of law or equity to enforce it against the resisting *cestui que trust.* This, however, is not a suit brought to enforce a contract made by a director with his company; nor is it brought by the company against the director; but it is a suit brought by stockholders of the company to compel an account by a director of the moneys received by him for valuable services outside of his duties as director, rendered by him to the company, and to restrain the company from paying him for other like services. It is proved, beyond all controversy, that the money received by H. V. Butler & Son and H. V. Butler, Jr. & Co., for the services rendered by them to the company, was not only not unreasonably large compensation therefor, but was less than the usual rates for such services. Witnesses, whose experience in the business enables them to speak intelligently on the subject, and entitles their testimony to weight, testify without exception that the price

46

received by those firms for the services rendered by them to the company was less than would have been required by strangers therefor. It also appears, by the testimony, that like arrangements made by paper manufacturing companies with their directors are by no means unusual. He who would have equity must do equity. If the contracts made with those firms are to be avoided, it must be on terms that they shall be allowed reasonable compensation for the services rendered by them. But they have, under the contract, received no more than that. What, then, remains to be said ?

But there is another consideration of importance upon this point. The complainants were the assignees of Taylor, and were, therefore, the owners of his stock three months before the first of those contracts was made. They had, at all times after that contract was made, an opportunity to test its validity. The courts were open to them, and yet it appears that they made no objections to it while it continued ; and it was not until after it had expired, and the firm with which it was made had gone out of existence, and another firm had taken its place and entered into an agreement for the same services with the company, that they came into court for relief. There was no concealment, nor any attempt at concealment. The evidence is that the arrangements appeared on the minutes of the board of directors. There is no complaint that the minutes were not accessible or ever withheld. On the contrary, Mr. Ramage swears that Mr. Sherman, one of the complainants, was present at the stockholders' meeting, in May, 1868 ; that the book of minutes was there ; that Mr. Henry V. Butler examined it then, and that Mr. Sherman sat beside him at the time ; and he says his recollection is, that Mr. Sherman had the book, but he is not positive as to this. He further says that the minute-book lay on the desk during the progress of the meeting. The complainants do not allege that they were ignorant of the existence of the resolution of January, 1868, or of that of 1871, or of any of the

material facts or circumstances in respect to which they ask relief at the hands of this court. The board of directors had power over the subject of those resolutions. By the sixth section of the charter it was provided that a majority of the directors for the time being, should form a board for transacting the business of the corporation, and should have power to ordain, establish and put in execution such by-laws, ordinances and regulations as they should deem necessary and convenient for the government, management and disposition of the stock, effects and concerns of the corporation. The president had power to appoint Henry V. Butler, Jr., superintendent of machinery, and to fix his compensation. The board had power to fix the salary of the president. There appears to be no ground of complaint in reference to the salaries, and the objections made in the bill on that subject are not pressed. A corporation may employ a member of its board of directors to transact business for it, for just compensation. There is nothing which forbids either the members or directors of a corporation to make contracts with it, like any other individual, and when the contract is made, the member or director stands, as to the contract, in the relation of a stranger to the corporation. *Stratton* v. *Allen*, 1 *C. E. Gr.* 229, 232; *Barnes* v. *Trenton Gas Light Co.*, 12 *C. E. Gr.* 33. Where valuable services have been rendered to the corporation by a member of its board, there appears to be no good reason in equity why he should not receive just compensation for them. And it follows that, if he has rendered the services and has received only just compensation therefor, there is no good reason in equity why he should be compelled to return it to the treasurer of the company. The language of Judge Strong (whose views and conclusions were approved by the supreme court of Pennsylvania), in *Ashhurst's appeal*, 60 *Pa. St.* 290, 314, is pertinent: "I come, then, to consider the facts that the purchasers were the same persons as those who, as directors, sold, and, as stockholders, authorized the sale. It is often said, and

truly, that the same persons cannot be both buyers and sellers in one transaction. They were not, strictly, in this. All the purchasers were not directors, who made the sale. But I make no account of that. Still, why may not directors of a corporation sell to themselves? Each director has an interest distinct and antagonistic to his interest as a mere man. There is identity of person, but not of interest. There must be many things which directors can do for their individual benefit which are binding upon the corporation of which they are directors. If they have advanced money, I cannot doubt they may pay themselves with corporate funds. If they have become liable as sureties for the corporation, they may provide for their indemnity. And, though ordinarily the law frowns upon contracts made by them in their representative character with themselves as private persons, such contracts are not necessarily void. They are carefully watched, and their fairness must be shown." The view expressed in the opinion in *Stewart* v. *Lehigh Valley R. R.*, 9 *Vr.* 505, 522, is not, at least so far as the legal character of the contract is concerned, in conflict with the language above quoted, for it is there said that " the true legal rule is, that such a contract is not void, but voidable; to be avoided at the option of the *cestui que trust*, exercised within a reasonable time." Nor is it, I think, in contravention of the views of the court in that case, to hold that their language in regard to the avoidance of the contract, was designed merely to express the general rule, and that the rule admits of qualifications, in equity at least. When the *cestui que trust* comes into equity to avoid the contract, even, it is reasonable that he should be required to show, as a ground for the action of the court, something more adverse to the contract than the mere fact that it was made with a director; for if it shall, as in the case in hand, appear, not only to be fair and just, but actually more advantageous to the company than any which could be made with a stranger, why should it be set aside to the detriment of the company?

Gardner v. Butler.

In *Chandler* v. *Monmouth Bank*, 1 *Gr.* 255, it was held that a provision .in the charter of a bank that no director should be entitled to any emolument unless the same should have been allowed by the stockholders at a general meeting, was intended to prevent the directors from taking compensation for the performance of their appropriate duties, and that sound construction did not require the exclusion of the individuals of the board from just compensation for services of a different character, because they were rendered while they were directors.

If the president of the Ivanhoe Manufacturing Company was not bound to make the sales and purchases, and the contracts with H. V. Butler & Son and with H. V. Butler, Jr. & Co., were reasonable, then the fact that the company has paid no dividend is of no importance in connection with the question under consideration. That fact is accounted for, partly, at least, by the depression in business, and it may well be that the difference between the results of the copartnership business of H. V. Butler & Co., and the results of the transaction of the same business by the Ivanhoe Manufacturing Company, is, to a considerable degree, attributable to the fact that there was less capital employed in the latter than in the former. It appears that, out of the surplus assets of the copartnership, after the organization of the company, Mr. Taylor and his assignee received $166,000. And it also appears that the firm lent the company $75,000, which were repaid. And here it may be remarked that the allegation in the bill that the $150,000 lent by Taylor to the copartnership has never been repaid, is not only denied by the answer, but is fully disproved by the evidence. Though the company appears to have been transacting its business at a loss, it does not appear to be insolvent.

The prayer for an account was based on the claim that the salaries and commissions in question should be accounted for and repaid. There does not appear to have been any refusal to account for the transactions of the com-

pany at any time, and, except in connection with the salaries and commissions, there was no ground for praying an account. That ground having failed, there will be no decree for an account.

The bill will be dismissed, with costs.

*Mr. Geo. De Forest Lord*, for appellants.

I. The organization of the Ivanhoe Manufacturing Company merely provided a different form and mode of holding the property and conducting the business of the pre-existing firm of H. V. Butler & Co.; and although it, in some respects, changed the relation of the parties to the *public*, it did not (and was not intended to) change their relations *towards each other*; so that, as between Robert L. Taylor and Henry V. Butler, the copartnership, in all its essential features and characteristics, continued *after* the formation of the company the same as it had done *before*.

*Smith* v. *Jackson*, 2 *Edw. Ch.* 28; *Delmonico* v. *Guillaume*, 2 *Sandf. Ch.* 366; *Hiscock* v. *Phelps*, 49 *N. Y.* 97.

II. This case being, therefore, at least one of a *quasi*-copartnership, though in the *form* of a corporation—if it is to be determined upon principles applicable to a continued copartnership, then there is no justification whatever for the commissions paid either to H. V. Butler & Son, or to H. V. Butler & Co., and they should be disallowed and the money refunded.

*Whittle* v. *McFarland*, 1 *Kn.* 311.

III. Even if the theory of a continuation of *quasi*-copartnership relations between Butler and Taylor after the organization of the company, were abandoned, and the acts of the parties were considered only upon principles applicable to corporate management, the successive agreements for commissions to be paid, first, to H. V. Butler & Son, and afterwards, to H. V. Butler, Jr. & Co., were invalid, and all payments made under them should be refunded.

Gardner *v.* Butler.

*Butts* v. *Wood*, 38 *Barb.* 181, 37 *N. Y.* 317; *ex parte Bennett*, 18 *Beav.* 339; *York and Midland R. Co.* v. *Hudson*, 16 *Beav.* 485; *Mayer* v. *Galluchett*, 6 *Rich. Eq.* 2; *Toold* v. *Wilson*, 9 *Beav.* 486; *Christopher* v. *White*, 10 *Beav.* 523; *Stewart* v. *Lehigh Val. R. R.*, 9 *Vr.* 505.

IV. The defendants cannot shield themselves by assimilating their case to those of officers who receive salaries from companies of which they are also directors, and who act as agents for such companies upon terms of compensation.

Wherever such contracts have been upheld, it will appear that the authority to make them comes from the action of the *stockholders alone*—not from the directors; and the more recent authorities hold, that such agreements with individual directors cannot be sustained, even where they are made with an independent board, unless fully submitted to and ratified by the stockholders collectively.

*Gt. Luxenbourg Railway Co.* v. *Magnay*, 25 *Beav.* 590; *Evants* v. *Coventry*, 8 *DeG. M. & G.* 835, 844; *Lindley on Partn.* (3 ed.) 570, 796; *Dunston* v. *Imperial Gas Co.*, 3 *B. & A.* 125.

*Mr. Thos. N. McCarter*, for respondents.

I. No relief can be founded on the allegation of the bill that the corporation was a mere change in form, and that, as between Butler and Taylor, their relations were still that of *partners;* and that the rights and obligations of partners, *inter sese*, still continued, notwithstanding the change; that such was the intention of the parties, and the court will give effect to it.

*Ang. & Ames on Corp.* § 499.

II. What rights has he as a stockholder in regard to salaries and commissions?

*Stewart* v. *Lehigh Valley R. R. Co.*, 9 *Vr.* 522.

III. But, if illegal, what is complainant's remedy?

He is in a court of equity; he must do equity; he cannot claim the benefit of the services rendered under this employment, without allowing fair compensation.

*Mulford* v. *Minch,* 3 *Stock.* 16; *Huston* v. *Cassidy,* 2 *Beas.* 228; *Smith* v. *Drake,* 8 *C. E. Gr.* 302; *Beeson* v. *Beeson,* 9 *Pa. St.* 286, *and cases there cited; ex parte Hughes,* 6 *Ves.* 617; *ex parte Bennet,* 10 *Ves.* 381; *Rogers* v. *Rogers, Hopk. Ch.* 525; *Davoue* v. *Fanning,* 2 *Johns. Ch.* 252.

See the subject discussed in 1 *White & Tudor's Lead. Cas.,* *Fox* v. *Mackreth,* (4 *Am.,* from 4 *London ed.* 172–3) 234, *Am. Notes* 259.

IV. But in any such case the *cestui que trust* may ratify the act and make it valid.

V. Sherman acquiesced.

By this it appears that, with the record before him disclosing these prior transactions, he voted to put in the same board; he has not denied it.

VI. The arrangement was made in good faith, and with the advice of counsel.

VII. The arrangement was perfectly fair.

It has been shown by all the evidence, that the commission allowed in this case is less than the current rate.

VAN SYCKEL, J.

By four successive agreements, the first dated May 1st, 1836, and the last dated June 1st, 1858, Henry V. Butler and Robert L. Taylor were engaged as partners in the manufacture and sale of paper. The manufacturing was carried on at mills in Paterson, in this state, and the buying and selling at the city of New York.

Taylor had married Butler's sister, and had confidence in his integrity and skill in the business, and he agreed to furnish the requisite capital, leaving to Butler the management and charge of the business, with the stipulation that they

were to share equally in the profits and losses of the under-taking.

By the third and fourth agreements, Butler was to have a salary of $5,000, as general manager, and one-half the profits. The business was conducted under these articles of copart-nership until March 31st, 1866, when they organized as a body corporate, by the name of "The Ivanhoe Manufac-turing Company," to carry on the same business, under an act of incorporation of this state. The organization was effected with a capital stock of $300,000, in shares of $100 each. By an arrangement between the parties, Butler sub-scribed for fifteen hundred and five shares, by which he secured control of the management of the company; Taylor subscribed for fourteen hundred and ninety shares, Aaron S. Pennington and E. Boudinot Colt for two shares each, and Andrew Derrom for one share. The five last-men-tioned shares were paid for by Butler. These five gentle-men were named in the legislative act as the first directors of the company. On its organization, at the first meeting of the board of directors, Butler was elected president, his powers, as then defined by resolution, being, "to manage and conduct all the manufacturing, mercantile and other busi-ness of the corporation, as in his judgment should appear to be for the best interest of the stockholders, and to appoint all such superintendents, managers and employes as he might deem proper, and at such salaries as he might deem proper for conducting the business."

The company issued one thousand additional shares of capital stock in 1867, of which Butler and Taylor each took one-half. Taylor took no active part in the business of the company. Its affairs were managed by Butler, who pur-chased the necessary materials and sold its manufactured paper.

On the 24th of October, 1867, Taylor failed in business, and on that day made an assignment of all his property for the equal benefit of his creditors, to the complainants. Up to that date, Butler, for all his services to the company, drew

as president (but without special authority to do so), an annual salary of $5,000, the same compensation which he had received from the firm of H. V. Butler & Co. After the failure of Taylor, Butler entered into the paper commission business in the city of New York, with his son, Henry V. Butler, Jr., under the name of H. V. Butler & Son.

On the 23d of January, 1868, the board of directors (of which Butler and his son were members) agreed to pay the firm of H. V. Butler & Son a commission of six per cent. on the gross amount of sales, for selling the paper manufactured by the company. On the 25th of May following, the salary of Butler was increased to $6,000, and on the 29th day of March, 1871 (the firm of H. V. Butler & Son having dissolved, and the new firm of H. V. Butler, Jr. & Co. formed, consisting of H. V. Butler, Jr. and one Campbell, as general partners, and H. V. Butler, Sr. as special partner), an agreement was made by the directors of the company with H. V. Butler, Jr. & Co., that they should make all the purchases, disbursements and sales for the company for a commission of six per cent. on the gross amount of the sales only. All the members of this copartnership were directors of the company, and the resolution authorizing the contract was passed by their votes.

The bill in this cause was filed by the assignees of Taylor, on the 20th of May, 1871, praying that the arrangement for the payment of salaries to Henry V. Butler and Henry V. Butler, Jr., and the agreement by which commissions were paid, may be set aside as fraudulent as against the complainants; that an account may be taken of the transactions of the company, especially of the sums paid for salaries and commissions; that the defendants may be restrained from paying those salaries or commissions, and that the complainants may have the benefit of such accounting, and receive what is due them as stockholders.

An amendment was made to the bill, praying for a receiver, on the ground of the alleged insolvency of the company.

In the first place, it is insisted that the copartnership between Butler and Taylor, in its essential features, continued after the formation of the company, the same as before; that the corporate body was a mere device for the more convenient prosecution of the partnership business, and that, therefore, the rights of the parties to this suit are to be ascertained and determined according to the principles which govern a copartnership between individuals, in which event one partner will be entitled to no remuneration for his services to the firm, in the absence of an agreement with his copartner for compensation. The evidence and circumstances surrounding this case fail to support this view of the appellants.

The acceptance of the charter, and the organization under it, clearly worked a dissolution of the partnership. It does not appear, according to my judgment, that a single act was ever done by the principals, or in their behalf, which testified to the continued existence of the copartnership, or which manifested the existence of an agreement or understanding, on their part, that the company was a mere auxiliary to the promotion of the partnership transactions. Obviously, one of the chief objects of incorporation was to limit their personal responsibility. The immunity they thereby intended to secure would, at least, have been endangered, if the partnership was still to be regarded as the principal, and the corporation its mere instrument or agency. That such a relation was to continue to subsist, was never declared by word or deed of the alleged parties to it.

No reason appears why the partnership should have been maintained; neither party could derive any benefit from it. It could not have been Taylor's purpose to retain an equal voice in the management of the business, for the most amicable relations continued to exist between the partners, and their confidence in each other was unshaken, so that Taylor did not hesitate to commit the control of the stock and of the affairs of the company to Butler.

That Taylor supposed that under the new arrangement he would still participate equally in the profits, there can be no doubt, and his expectations were realized in the fact that, up to the time of his insolvency, Butler continued to superintend the business, and to negotiate and make the sales and purchases, at the same compensation he had received before that time.

The same considerations which had prompted Butler to form the partnership, still influenced him in conducting the affairs of the corporation. The company would undoubtedly have had the benefit of pecuniary aid from Taylor in any emergency, as fully as the partnership had received it. Although he was under no legal obligation to extend it, his interest would have led him to do so. For this, and by reason of the relationship existing between them, it may reasonably be presumed that Butler was willing to render his services as before, while the benefit accrued to his brother-in-law.

But when Taylor became insolvent, the considerations which moved Butler wholly failed. Strangers would reap the advantage of his skill and labor, and the company was deprived of the assistance of a capitalist who had a very large interest in sustaining its credit and promoting its success. If the partnership had then existed, it would have been dissolved by Taylor's insolvency and consequent voluntary assignment for the benefit of his creditors. 3 *Kent Com.* 57; *Arnold* v. *Brown*, 24 *Pick.* 89; *Collyer on Part.* §§ 111, 112. It was a relation founded on personal confidence, and Butler could not have been compelled to receive a stranger into the association. After the assignment there could have been no partnership, so far as the complainants were concerned, without the assent of Butler, and Butler was under no obligation, either legal or moral, to render his services to the company without just remuneration. The rights of these parties must be adjudicated upon the law applicable between shareholders of corporations and their directors, in the management of corporate property.

Gardner v. Butler.

On this branch of the case, the complainants claim that the directors of the corporation occupied a position of trust which disabled them from making a valid contract with themselves, and that, therefore, all payments to themselves under the special agreements were illegal, and should be refunded.

That directors of a company shall not be permitted to enter into engagements in which they have a personal interest conflicting with the interests of those whom they are bound by fiduciary duty to protect, and that no consideration of their apparent or intrinsic fairness will induce a court, either of law or equity, to enforce them against the resisting *cestui que trust,* is well settled. The rule has been so recently asserted in this court that it must be assumed to be the law of this case. *Stewart* v. *Lehigh Valley R. R. Co.,* 9 *Vr.* 505.

The rule is, that the trustee cannot fortify himself by a contract which he makes with himself, or for his own benefit, and set it up, either at law or in equity, as a valid obligation. It is of no binding force as a contract, and the *cestui que trust* may repudiate it at will. The agreements, therefore, which the directors made with themselves, must be pronounced to be illegal, and can furnish no support to their defence, as contracts. But while the express undertaking is without legal force, the directors of a company have a right to serve it in the capacity of officers, agents or employes, and for such services the law will enable them to recover a just and reasonable compensation. The law restrains them from making a contract where their own gain intervenes between their exercise of judgment and their duty as trustees, but it does not operate to deprive the company of the service of those who, in many cases, may alone possess the skill requisite to the successful management and conduct of the corporate business, and who may have the chiefest interest in its prosperity. Stockholders, because they are directors, are not compelled to commit the success of their company to strangers, or else render their

own services gratuitously. No claim which they may make against their company can acquire any support or validity from the fact that they have expressly sanctioned it; it must rest exclusively upon its fairness and justice, and be enforced upon the *quantum meruit.* That such is the full scope and effect of the rule, and the extent to which the transaction is annulled, will be found by an examination of the cases.

*Aberdeen Railway* v. *Blakie*, 1 *Macq. H. L. Cas.* 461, is much relied upon by the complainants. There Blakie, who was chairman of the railway board, made a contract for railroad chairs with the firm of which he was a member. The company, after accepting some of the chairs, refused to receive the balance, and he instituted his suit to compel the performance of the contract. It was properly held that the company had a right to repudiate the contract, and that it could not be enforced against their dissent. If the action had been brought to recover for the chairs which had been delivered and accepted, I apprehend it would not have been held, in any court, that the company could have retained the property and have refused to pay for it—not the contract price, but what it was reasonably worth. This case would be applicable to this discussion, if a new board of directors had refused to recognize the validity of the agreement with Butler, and he was now attempting to enforce a claim for damages for not continuing the employment for the stipulated term. It may be safely asserted that no authority can be found which will permit a corporate body to retain property conveyed to it by a director, or to receive services which he was not bound to render as a director, without paying him a fair equivalent.

In *Flanagan* v. *Great Western Railway*, *L. R.* (7 *Eq.*) 116, the contract with the director was executory, and the court refused to order a specific performance of it. In *Butts* v. *Wood*, 37 *N. Y.* 317, the suit was maintained by a stockholder to set aside the proceedings of directors, who fraud-

ulently voted and paid an unjust claim to one of their number.

The right of directors to vote themselves $200,000, for a grant they had transferred to their company, was successfully challenged in *Coleman* v. *Second Av. R. R.*, 38 *N. Y.* 201. The directors claimed that if the company repudiated their acts in purchasing from themselves, they must restore the grant. To this the court answered, that the plaintiffs had not asked for any such judgment; that their claim was based entirely upon the validity of their transfer, and the judgment of the referee for the full claim was based upon that only, and that therefore the referee's judgment was rightly reversed by the general term. There was another sufficient reason in that case for not requiring a restoration of the grant: The court held that the directors had no title to the grant at the time they transferred it to the company, consequently there was nothing to be restored.

The doctrine is well stated in *Great Luxembourg Railway* v. *Magnay*, 25 *Beav.* 586, where Magnay, who was president of that company, was furnished with the money to purchase for his company the concession of another line, and purchased it from himself, being the concealed owner of it. The master of the rolls said: "I proceed to explain what I mean by the proposition that an agent or a trustee cannot retain any benefit for himself from such a transaction. Suppose a company desired to buy an estate, and the trustee undertook to buy it for them, concealing the fact that it was his own estate, and if he then sells it to the company of which he is a director, for double its value, the court would not allow the transaction to stand It would say to the company, you must repudiate the bargain altogether, or you may adopt it if you think fit, but if from any circumstance whatsoever it becomes impossible to return the estate, all that the trustee would be entitled to would be the full value of the estate sold; but when it is said that he cannot make any profit by the transaction, it is not meant

that he is not to have the proper value of the property which is actually taken by the company."*

The same principle must apply, whether it is property conveyed or services rendered to the company. The cupidity and avarice of the trustee is guarded against by giving the *cestui que trust* the right to repudiate the contract at all times, where it is executory, and to allow simply a just remuneration, without reference to the contract price, where it is executed. The trustee thus derives no advantage from his breach of duty, and the company can suffer no detriment from his service in their behalf.

In this case, Butler, being a director, made a contract with the board to serve as president for a fixed salary, and he also agreed that the firm of which he was a member should sell the manufactured goods of the company for a certain percentage of the gross amount of sales. He had a right to serve the company as president, and also to sell their goods and to receive an allowance for it, but he had no right to make a bargain by which his remuneration was fixed. The position he occupied incapacitated him from doing that, because it involved a conflict between his official duty and his personal gain. The company had no right to presume that Butler had assented to serve for the salary he had received prior to Taylor's insolvency; because the resolutions passed were equivalent to a notice that he demanded an increase, and that he would no longer perform in person a portion of the duties which had devolved upon him prior to that time. He could not bargain for the sum he should receive, but he had a right to terminate the employment on the then existing terms, and leave his compensation to be determined by a proper tribunal. The contract will not be regarded, but the services having been rendered, and the company having received the benefit of them, it would be manifestly inequitable to deny to the trustee a fair equiva-

[* See *Trenton Banking Co.* v. *McKelway,* 4 *Hal. Ch.* 84.—REP.]

lent for them. It would pervert a rule of law which is intended to guard against fraud and injustice.

The right of a trustee to recover on the *quantum meruit*, where the contract is illegal, is recognized in our courts. *Mulford* v. *Minch*, 3 *Stock.* 16; *Huston* v. *Cassedy*, 2 *Beas.* 228; *Smith* v. *Drake*, 8 *C. E. Gr.* 302; *Stratton* v. *Allen*, 1 *C. E. Gr.* 229.

The case resolves itself, then, into this question: Have the directors, whose action is the subject of controversy, retained for their services more than they are justly and reasonably entitled to? The burden is on them to show what they reasonably deserve to have, and no unjust exaction will be permitted.

The objection to the salary of the president is not pressed, and all the witnesses of experience concur in saying that the commission charged was moderate and within the customary rates. The sums claimed by the defendants appear to have been fairly earned, and may therefore be retained by them.

There is no proof of insolvency. When the bill was filed, in 1871, the assets of the company were valued at $359,000, and the debts were only $2,459. It does not appear that since that date its condition has materially changed.

The decree below should be affirmed, with costs.

Decree unanimously affirmed.