HOMER F. MERRIMAN

*v.*

NATIONAL ZINC CORPORATION et al.

[Submitted December 5th, 1913. Determined January 28th, 1914.]

1. Two certain contracts were made between the corporation and one H., the first granting to him and his assignees for a term of years the exclusive right of mining for minerals (except limestone and clay), in certain lands, the mining rights in which the company owned, he being required promptly to begin active operations in prospecting for ore and to spend $10,000 in prospecting work, unless ore should be found in marketable quality by the expenditure of a less amount, and being required to pay the company twelve and one-half per cent. of the gross receipts from sales of ore, as royalty; and the other contract authorizing H. to prosecute certain claims of infringement on the company's mining rights, and to pay to the company one-half of the gross amount recovered. Upon a bill by a stockholder of the company in behalf of the company to set aside said contracts, evidence *Held* not to warrant the conclusion that said contracts, as alleged in the bill, were made in disregard of the best interests of the corporation, the same having been authorized by formal votes of

the company's board of directors, and at the next succeeding annual stockholders' meeting reported to, and approved by, the stockholders.

2. There can be no doubt of the right of this court to relieve against the operation of fraudulent action of a board of directors of a corporation, at the instance of a single stockholder, in the absence of intervening rights of third parties.

3. The operative force of any action by a board of directors of a corporation is necessarily found in its quality as an honest exercise of the legitimate functions of office; the supervisory and remedial powers of this court exist only for the purpose of insuring the honest exercise of such official powers and cannot be extended further. In matters of business management within the powers of the board its judgment, if honestly exercised, must control, and not the judgment of this court.

4. Direct interest of members of the board of directors in a contract made by the board may render such contract voidable as a contract made by a trustee with himself touching the property of his *cestui que trust,* and gross inadequacy of consideration may afford a badge of fraud; but no justification can be found for the assumption that the members of a board have not exercised their honest judgment in behalf of the corporation represented by them because private interests of members of the board, which are wholly unconnected with the contract authorized by the board, may be enhanced by the action taken.

5. The failure of the contract first above recited to require H. to spend more than $10,000 in development work does not justify the conclusion that an honest business judgment of the board was not exercised, it appearing that fully three times that amount has in fact been expended in development work by the corporation to which H. assigned the contract; and without successful development work the contract was clearly valueless to H. or his assigns.

6. Individual stockholders cannot question, in judicial proceedings, the corporate acts of directors, if the same are within the powers of the corporation, and in furtherance of its purpose, are not unlawful or against good morals, and are done in good faith and in the exercise of an honest judgment. Questions of policy, of management, of expediency of contracts or action, of adequacy of consideration not grossly disproportionate, of lawful appropriation of corporate funds to advance corporate interests, are left solely to the honest decision of the directors if their powers are without limitation and free from restraint. To hold otherwise would be to substitute the judgment and discretion of others in the place of those determined on by the scheme of incorporation.

7. There is no such recognized trust relation between stockholders of a corporation as will impose upon one who may be interested in a transaction, the authorization of which is being acted upon at a stockholders' meeting, the burden of establishing his good faith in the vote which he has cast. The action may be so clearly detrimental to the corporation itself as to render it a fraudulent destruction of the rights of minority stockholders; but the personal interests of a stockholder will not in itself deny such stockholder the right to cause his stock to be voted in the line of his personal interests.

8. Stockholders of a corporation who possess the major portion of its stock cannot by force of their votes lawfully appropriate the property of the corporation to their own use in disregard of the rights of other stockholders.

On final hearing on bill to set aside certain contracts.

*Mr. Hugh B. Reed,* for the complainant.

*Mr. S. Stanger Iszard,* for the defendants.

LEAMING, V. C.

The bill is filed by a stockholder of the Sussex Calcite Company in behalf of that corporation to set aside two certain contracts made by that company with Eugene Howard, bearing date February 21st, 1908, and March 18th, 1908, respectively. The rights of Howard under these contracts have been assigned to and are now held by defendant National Zinc Corporation.

These contracts were authorized by formal votes of the board of directors of the Sussex Calcite Company and at the next succeeding annual stockholders' meeting of that company, held April 8th, 1908, were reported to and approved by the stockholders.

The bill challenges the integrity and sufficiency of the actions taken at the two directors' meetings and also at the stockholders' meeting. It is claimed that the actions taken at the directors' meetings were not the exercise of sound or honest business discretion by the board, but were taken in bad faith and in disregard of the interests of the corporation represented by the board and in the interest of members of the board. The confirmatory action taken at the stockholders' meeting is challenged by the claim that an affirmative vote of two-thirds of the outstanding stock of the corporation was necessary to validate the contracts and that less than that amount of stock was voted in support of the resolution of confirmation; it is also claimed that the vote of approval of the stockholders' meeting was influenced and made possible by reason of secret interests which certain stockholders held with Howard in these contracts.

There can be no doubt of the right of the court of chancery to relieve against the operation of fraudulent action of a board of directors of a corporation at the instance of a single stockholder in the absence of intervening rights of innocent third parties. Nor can stockholders of a corporation who possess the major portion of its stock by force of their votes lawfully appropriate the property of the corporation to their own use in disregard of the rights of other stockholders. While it is held, in *United States Steel Corporation* v. *Hodge, 64 N. J. Eq. (19 Dick.) 807,* that a stockholder's personal interests will not disqualify him from voting his shares at a stockholders' meeting, no suggestion is there found to the effect that any measure can be given vitality by either illegal or fraudulent action of stockholders.

The contract of February 21st, 1908, bestowed upon Howard and his assignees for a term of fifty years the exclusive right of mining for all minerals except limestone and clay in certain lands in which the Sussex Calcite Company then owned the mining rights. The contract required Howard to promptly begin active operations in prospecting for ore and to spend $10,-000 in prospecting work unless ore should be found in marketable quantity by the expenditure of less than that amount; when found the work of mining and selling ore was to be prosecuted with diligence. Twelve and one-half per cent. of the gross receipts from sales of ore were to be received by the Sussex Calcite Company as a royalty. The contract of March 18th, 1908, authorized Howard to prosecute certain claims of infringement on the mining rights of the Sussex Calcite Company and to pay to that company one-half of the gross recovery. At about the time these contracts were made another contract was made with another party leasing to that party the mining rights of the Sussex Calcite Company for limestone and clay. These three contracts, taken together, covered substantially all the property of the Sussex Calcite Company except the surface rights of the land; the surface rights were held by the Sussex Calcite Company under contract of purchase and have been since paid for and are now owned by that company subject to certain mortgage encumbrances.

At the time these leases of mining rights were made by the board, and also at the time they were approved by the stockholders, the affairs of the Sussex Calcite Company were in an embarrassed condition. Stock of the company had been sold by its officers under representations which were by officials of the United States government deemed fraudulent, and what is known as a "fraud order," had been issued, forbidding the Sussex Calcite Company the use of the mails and the officers of the company were under indictment by the federal grand jury on like charges. Thus discredited it was clearly impossible for the company to procure funds for development work by the sale of its stock, and such development work as had been done by the company had shown no favorable results. Under these conditions it was apparent to the officers of the company that if development operations could be promptly begun and ore discovered in paying quantities a valuable defence to the pending indictments would be afforded. This circumstance is urged by complainant as the impelling motive of the lease of mining rights to Howard. The by-laws of the Calcite company provided for a board of five directors. Five had been elected, but two had resigned. At the time of the Howard lease two of the three qualified directors were under indictment for the cause stated; the lease to Howard was authorized by vote of these three members of the board. At the date of the second Howard agreement an additional member of the board had qualified. This court is accordingly asked to find that in making the mining lease to Howard the board was guided by selfish purposes of its members in a desire to afford for two of them, as well as for others who were also indicted, a valuable defence to the indictments, and that by reason of these selfish purposes the board disregarded the rights and interests of the company and thus failed to exercise its legitimate function of management. It is urged that this is apparent not only by the personal embarrassments and needs of two of the three of the board, but also from the circumstance that the mining contract does not obligate Howard to spend more than $10,000 for prospecting purposes. It is also claimed that one of the members of the board had a secret interest with Howard—that claim will be considered later.

32

As already suggested, the operative force of any action by a board of directors of a corporation is necessarily found in its quality as an honest exercise of the legitimate functions of office; the supervisory and remedial powers of this court exist only for the purpose of insuring the honest exercise of such official powers and cannot be extended further. In matters of business management within the powers of the board its judgment, if honestly exercised, must control, and not the judgment of this court. Direct interest of members of the board in a contract made by the board may render such contract voidable as a contract made by a trustee with himself touching the property of his *cestui que trust*, or gross inadequacy of consideration may afford a badge of fraud; but no justification can be found for the assumption that the members of a board have not exercised their honest judgment in behalf of the corporation represented by them because private interests of members of the board, which are wholly unconnected with the contract authorized by the board, may be enhanced by the action taken. Nor does the failure of the contract to require Howard to spend more than $10,000 in development work justify the conclusion that an honest business judgment of the board was not exercised. The evidence discloses that fully three times that amount has in fact been expended in development work by the corporation to whom Howard assigned the contract; and without successful development work the contract was clearly valueless to Howard or his assigns. The rule as stated in *Ellerman* v. *Chicago Junction Railway Co.*, *49 N. J. Eq.* (*4 Dick.*) *217, 232*, is as follows: "Individual stockholders cannot question, in judicial proceedings, the corporate acts of directors, if the same are within the powers of the corporation, and in furtherance of its purpose, are not unlawful or against good morals, and are done in good faith and in the exercise of an honest judgment. Questions of policy, of management, of expediency of contracts or action, of adequacy of consideration not grossly disproportionate, of lawful appropriation of corporate funds to advance corporate interests, are left solely to the honest decision of the directors if their powers are without limitation and free from restraint. To hold otherwise would be to substi-

tute the judgment and discretion of others in the place of those determined on by the scheme of incorporation."

It is claimed that Richards, one of the directors, was directly interested with Howard in the contracts and was to receive a percentage interest from Howard. Richards has testified to that fact with shameless effrontery. It is difficult for testimony to carry less conviction than his testimony of that fact. He had theretofore stated to the exact contrary, and the evidence disclosed that he did not receive the stock to which he would have been entitled after the organization of defendant company had such an agreement existed between him and Howard. A finding that such an agreement existed is not justified.

I am not aware that any attack is made on the contract of March 18th, 1908, other than the general claim that its authorization was not the exercise of sound business judgment by the board of directors.

It remains to consider the action taken at the stockholders' meeting. At the annual stockholders' meeting succeeding the action of the directors, already referred to, a resolution was adopted approving these contracts with Howard, and also approving the contract, heretofore referred to, leasing the Calcite mining rights to another person. It is urged in behalf of complainant that these three contracts, taken together, disposed of practically all the property of the Calcite company, and, in consequence, required the assent of two-thirds of the stockholders, by reason of the provisions of the act of March 24th, 1899. *Comp..Stat. p. 1600 § 2a.* The evidence clearly establishes that more than two-thirds of the outstanding stock of the Sussex Calcite Company was voted in approval of these contracts, unless it be found that one Bagley, who was present at the stockholders' meeting, failed to vote the stock represented by him in favor of the resolution of approval. Bagley has been called as a witness and has testified that he did vote for the resolution of approval. It is impossible to doubt the accuracy of his testimony. He is wholly without interest in the controversy and has stated that he was sent to the stockholders' meeting as a proxy expressly to vote for the approval of these contracts, and the owner of the

stock represented by Bagley has also testified that he sent Bagley as his proxy with that specific instruction. The error in the minutes is explained by the fact that at the stockholders' meeting the resolution of approval included with the contracts here in question the contract already referred to which leased the mining rights of limestone and clay, and Bagley explained at the meeting that he would vote against the approval of that contract if the resolution of approval should be divided; but failing to procure a division, he voted for the resolution as presented. I entertain no doubt that the stock represented by Bagley was voted as he states, and that more than two-thirds of the outstanding stock of the Sussex Calcite Company was voted to approve the contracts here in question.

It is undoubtedly true that some of the stock which was voted for the approval of these contracts was owned by persons who expected to become associated with Howard in a corporation which would take over these contracts and operate under them. While their votes could not lawfully authorize a wanton or fraudulent disposition of the assets of the corporation, the rules defined in *United States Steel Corporation* v. *Hodge, supra,* render it clear that they were not disqualified from voting their stock by reason of their personal interests. In the *Hodge Case* directors who were interested in the bankers' contract which was before the stockholders' meeting for approval were held to have been privileged to vote as stockholders, and no question was there raised against the right of interested stockholders to vote who were not directors. There appears to be no such recognized trust relation between stockholders of a corporation as will impose upon one who may be interested in a transaction, the authorization of which is being acted upon at a stockholders' meeting, the burden of establishing his good faith in the vote which he casts. The action may be so clearly detrimental to the interests of the corporation itself as to render it a fraudulent destruction of the rights of minority stockholders; but the personal interests of a stockholder will not in itself deny such stockholder the right to cause his stock to be voted in the line of his personal interests. The rule, as stated by Judge Thompson, in his work on *Corporations,* is as follows:

"It is well settled that the stockholders do not hold fiduciary relations to each other in the sense that one is prevented from voting at a stockholders' meeting on a question in which he has an individual interest." *4 Thomp. Corp. (2d ed.)* § *4467.*

I am unable to reach the conclusion that the contracts here in question can be said to have been made in disregard of the best interests of the corporation. The value of the mining rights of the corporation were wholly problematical and speculative; if minerals in paying quantities could not be found the rights were valueless. Minerals had not been found and further development work by the corporation had become practically impossible. The contract reasonably insured the further prosecution of development work and a liberal royalty in case minerals were discovered. Approximately, $30,000 has been spent by the assignee of the contract in this development work and no minerals have yet been found. The bill avers that this expenditure has been purposely misdirected, with a view to avoid the discovery of minerals, but the evidence does not establish that fact.

The views here stated render it unnecessary to consider whether complainant's right to prosecute this suit is barred by laches or by his stock having been voted by his proxy in affirmance of the contracts in question.

I will advise a decree dismissing the bill.