## UNITED STATES v. READING CO. et al.

(District Court, E. D. Pennsylvania. August 8, 1923.)

No. 1095.

1. **Monopolies ⟨⟩26(2)—Fairness of sale by railroad company of stock of coal company; order by decree of court held not impeached.**

Evidence *held* insufficient to sustain the claim that a sale by a railroad company of the stock of a coal company, ordered by decree of court, was collusive or for an inadequate price, where the stock was sold for approximately $32,000,000, there were five independent sealed bids, with no great variance between them, and the difference between the accepted bid and the next highest was less than $250,000.

2. **Monopolies ⟨⟩26(2)—That sale of coal stock by railroad made to friendly interests not ground for avoiding.**

Under a decree in a suit under Anti-Trust Act July 2, 1890 (Comp. St. § 8820 et seq.), requiring a railroad company to sell its stock in a coal company, so as to establish entire independence between the two companies, if a complete and honest separation of the properties was effected and entire independence established by a sale, the fact that the stock was sold to friendly purchasers, who for economic advantage may continue to ship coal over the railroad, does not make the sale illegal, or constitute ground for setting it aside.

3. **Evidence ⟨⟩113(4)—Intrinsic and market value of corporate stock.**

The intrinsic value of stock of a corporation does not determine what it should sell for at a specified time under particular circumstances, if a bona fide market price can be established.

In Equity. Suit by the United States against the Reading Company and others. On intervening petition of Isaac T. Starr and wife to set aside sale of stock of the Lehigh & Wilkes-Barre Coal Company. Petition dismissed.

Robert Dechert, C. J. Hepburn, and George Wharton Pepper, all of Philadelphia, Pa., for petitioners.

F. M. Rivinus, of Philadelphia, Pa., and Richard V. Lindabury, of Newark, N. J., for respondent Central R. Co., of New Jersey.

Before BUFFINGTON and DAVIS, Circuit Judges, and THOMPSON, District Judge.

DAVIS, Circuit Judge. The mandate of the Supreme Court in the above-stated cause required the Central Railroad Company of New Jersey, hereinafter called the Railroad Company, to dispose of the stock which it held in the Lehigh & Wilkes-Barre Coal Company, hereinafter called the Coal Company. On June 6, 1921, this court entered its decree directing the Railroad Company to sell within six months its stock in the Coal Company. 273 Fed. 848. Accordingly on November 17, 1921, the Railroad Company sold its stock to the Reynolds Syndicate. This proceeding is a petition by Isaac T. Starr and Mary T. W. Starr, his wife, owning between them 200 shares of the stock of the Railroad Company, to set aside the sale and order a new sale. Several stockholders of the Railroad Company filed petitions for the same purpose, but later withdrew them. The first petition filed by Mr. and Mrs. Starr was a dependent petition, filed December 9, 1921. After the

other petitions were withdrawn, they filed an independent petition on March 10, 1922, and a supplemental petition on July 5, 1922. In these petitions it is charged that the sale was not a "good-faith compliance with the decree of sale made by this court," in that, first, the sale was not "so conducted as to yield the best price reasonably obtainable for the coal stock sold; and, second, that the value of his (Starr's) Jersey Central investment should not be jeopardized by a continuance of the same old unlawful combination between the Jersey Central and the Coal Company;" that the "bids invited in this case were used only to cover a transfer of the coal stock to a favored purchaser for an inadequate price," or that the sale was made "under such circumstances suggesting an arrangement to retain for the Jersey Central the tonnage originated by the Coal Company." The Railroad filed an answer to the supplemental petition, and elaborate proofs have been submitted.

[1, 2] The Supreme Court said:

"That such disposition shall be made by the decree of the stocks and bonds of the Lehigh & Wilkes-Barre Coal Company, held by the Central Railroad Company of New Jersey, as may be necessary to establish entire independence between these two companies." United States v. Reading Co., 253 U. S. 26, 64, 40 Sup. Ct. 425, 435 (64 L. Ed. 760).

The question of first importance is whether or not the sale did establish entire independence between these companies, or whether the stock was sold on condition, or with the understanding, express or implied, that the output of the Coal Company was thereafter to be shipped over the lines of the Railroad Company. If there was such an understanding, it would continue the evil which the Supreme Court had declared illegal and had sought to remedy. In that event the sale should be set aside, even though the price be amply adequate. The Railroad Company may not do secretly and by indirection what it may not do openly and directly. The court will look through forms to facts. On the other hand, if a complete and honest separation of the rail and coal properties was effected, and entire independence established by the sale, the fact that the stock was sold to friendly purchasers, who, for economic advantage, may continue to ship the coal over the railroad, does not render the sale illegal, nor constitute ground for setting it aside.

That the directors desired to retain the tonnage was perfectly natural. To retain this freight may have been their main concern, their "chief desideratum;" but that desire does not render the sale invalid. The test is whether or not the purchasers in good faith bought it for themselves, and not for the interest of the Railroad Company. If the sale was made in accordance with the decree of the court, and the entire independence of the companies established, the future retention of the traffic by the Railroad Company, not by agreement, but for natural economic reasons in marketing the coal, is not a violation of the Anti-Trust Act of July 2, 1890 (Comp. St. § 8820 et seq.). The directors of the Railroad Company could not and would not be expected to be indifferent to the retention of freight paying annually $10,000,000. Our concern, however, is whether or not the purchasers, in buying

the stock, were acting for or on behalf of any stockholder of the Railroad Company, or "in concert, agreement, or understanding with any other person, firm, or corporation for the control of the Lehigh & Wilkes-Barre Coal Company, in the interest of the Central Railroad Company of New Jersey," or were acting in good faith for themselves.

The decree of June 6, 1921, of this court provides among other things that:

"The Central Railroad Company of New Jersey shall dispose of all the capital stock of the Lehigh & Wilkes-Barre Coal Company now owned by it to persons or corporations who are not its own stockholders or stockholders in either the Reading Company, the Railway Company, or the Coal Company, and who previous to or at the time of purchase shall qualify as purchasers by a duly executed affidavit," setting forth inter alia: "That deponent does not own in his own right any shares of the capital stock of the Central Railroad Company of New Jersey, Reading Company, Philadelphia & Reading Coal & Iron Company, whether registered in his own name on the books of said companies or any of them, or registered in the names of others for deponent's use and benefit. That deponent in receiving the said certificate or certificates is not acting for or on behalf of any stockholder of the Central Railroad Company of New Jersey or of any others of the said companies, or in concert, agreement, or understanding with any other person, firm, or corporation for the control of the Lehigh & Wilkes-Barre Coal Company in the interest of the Central Railroad Company of New Jersey or any other of the said companies, but is acting in his own behalf in good faith."

Every purchaser subscribed to an affidavit containing the above provision. These affidavits should be accepted as true, unless there is clear evidence to the contrary, and there is no such evidence. After careful investigation the Department of Justice stated to the court that these affiants were qualified as proper purchasers of the stock. If these affidavits are not true, not only has the Anti-Trust Act been violated, but every affiant is guilty of perjury, and the directors, who know and are parties to this entire transaction, are guilty of subornation of perjury. The evidence does not support such a conclusion.

Was the sale a compliance in good faith with the decree of this court? If it was, that is the end of this proceeding. The petitioners contend that it was not, and that the price was so inadequate as to indicate fraud. At their meeting on November 17, 1921, the directors had five bids before them, tabulated substantially as follows:

| | Total Without Interest. | Interest on Deferred Payments, if Payments Not Anticipated. | Total Including Interest. |
|---|---|---|---|
| Reynolds Syndicate | $31,410,780.00 | $1,080,200.00 | $32,490,980.00 |
| Lehigh Coal & Navigation Company | 32,259,720.00 | None | 32,259,720.00 |
| Franklin Securities Company | 31,920,144.00 | None | 31,920,144.00 |
| Massachusetts Gas Company | 29,125,000.00 | 1,474,861.11 | 30,599,861.11 |
| Brown Bros. & Co. | 28,694,172.00 | 1,101,924.12 | 29,796,096.12 |

They also had before them the several values of the stock; book value, $30,167,000; the value based on its earnings for the last ten years, $30,342,000; the value based on its earnings for the last six years, including two abnormally good years, $34,102,000; and the value

placed on it by Mr. Richards, as they understood his figures, $36,-341,000. The average of these values is $32,728,000. The bid of the Reynolds Syndicate was $32,490,980, which is $247,020 less than the average, $3,850,020 less than the highest, and $2,323,980 more than the lowest. With these facts before them, did they act in good faith in selling to the Reynolds Syndicate, the highest cash bidder? Mr. Daniel Willard, president of the Baltimore & Ohio Railroad Company, one of the directors, recorded the following reasons, which we quote from the testimony, for voting to accept the bid of the Reynolds Syndicate:

"Mr. Willard seconded the motion to accept the bid of Jackson E. Reynolds and associates, stating he did so because it was in effect the highest bid, and in all respects the most satisfactory. He said he believed the price offered was one that under all the circumstances should be accepted, and that he personally was gratified that bids in substantial amounts had been made. Mr. Willard said the committee had endeavored to make it clear to prospective bidders that the Central Railroad of New Jersey was selling its holdings of stock in the Lehigh & Wilkes-Barre Coal Company, and not the assets of that company, and, in order that they might be fairly comparable, bids had been requested on a cash basis. All of the bids provided for a proportion payable in cash, the balance in installments; three providing for such payments within the time limit set by the board, and two failing to do so. Three of the bids stipulated that interest should be paid on deferred payments, while two of them failed to make such provision. The second highest bid, that of the Lehigh Coal & Navigation Company, he understood, required substantially a guaranty of the balance sheet as submitted by the officers of the Lehigh & Wilkes-Barre Coal Company under date of July 31, 1921, and the assumption by the seller of any obligation for taxes, etc., not stated in said balance sheet. As there had not been included in the balance sheet of July 31, 1921, a proportionate amount representing federal income and excess profit taxes accrued for the current year, which officers of the company had estimated over $1,000,000, this would have the effect of reducing the bid of the Lehigh Coal & Navigation Company by that amount, and would also make the Central Railroad Company liable in the event of any further assessments, any charges, on account of federal taxes for years subsequent to 1917, since which time it was understood the government had not made a check of the accounts. Whether the company would have the benefit of any appreciation in assets to the date of sale was not clear. Mr. Willard stated further that in view of the uncertainties as to realization under proposal of the Lehigh Coal & Navigation Company, and because the bid of Jackson E. Reynolds and associates was definite, being an outright purchase payable upon delivery of the shares and computing interest on deferred payments, it was the highest bid, and he voted to accept the same."

[3] There are two kinds of value, intrinsic and market. The price realized was not the highest intrinsic value placed upon it by Mr. Richards. But there is often a wide difference between intrinsic value and market value. So great is this difference that intrinsic value is not admissible in evidence as indicating what a commodity should sell for at a specified time under particular circumstances, if bona fide market value can be established. "The intrinsic value of a stock is not only not an infallible guide to its price in the market, but is, in fact, no guide at all." Douglas v. Merceles, 25 N. J. Eq. 144; Trust & Savings Co. v. Home Lumber Co., 118 Mo. 447, 24 S. W. 129; Henry v. North American Railway Construction Co., 158 Fed. 79, 85 C. C. A. 409. This was a large sale, and at the time it was being negotiated the money market was high, taxation was increasing, strikes were imminent, and

government control and regulation of coal mines were being agitated. These made the task of the directors difficult. The bids of these five large corporations, informed and enlightened by men of experience and the best experts obtainable, are remarkably close together. Fraud has not been proved, and the price was not so inadequate, if inadequate at all, as to be a badge of fraud. The directors acted in good faith and used their best judgment, and in the absence of fraud the court will not substitute its judgment for that of the directors. Venner v. Southern Pacific Co. (C. C. A.) 279 Fed. 832; Merriman v. National Zinc Corporation, 82 N. J. Eq. 493, 89 Atl. 764. These bids were evidence of fair market value, and, having accepted the bid which they considered the highest and most satisfactory, we cannot say that the price was inadequate.

Another ground on which petitioners seek to establish their contention is the allegation that the directors did not allow sufficient time, with the information furnished, for prospective purchasers to make such an investigation of the value of the property as would enable them to bid an adequate price for it. The length of time required for such an investigation is a matter of dispute. The time, according to the experts, ranges all the way from three weeks to a year, with a staff of 125 or more skilled men. The time necessary to make an investigation depends upon its object and the thoroughness with which it is made. The wide divergence among these experts of equal fame may be due to the kind of investigation they had in mind and the purpose of it. It is perfectly possible that a detailed investigation, involving elaborate expert study and professional refinement, such as a capable engineer would unconsciously think of when preparing for litigation, may be entirely different from the investigation he would have in mind when in practice he was working with all possible speed to give his client an idea of the intrinsic value of a property which would enable him to make an intelligent bid on it within a particular time. If the experts in this case had the same thing in mind, and were proceeding from the same point of view, they were unconsciously influenced by their association and the purpose of their testimony, for it is strikingly singular that the testimony of every expert fits in harmoniously with the theory of the side for which he was testifying. The time set by the directors for bidding was from September 29 to October 27, 1921. No complaint or request for lack of time to bid was made by or on behalf of any bidder, except the Lehigh Coal & Navigation Company, which on October 24, 1921, three days before the bids were to be in, first indicated its desire to make a bid, and requested sixty days in which to prepare it. The time was subsequently extended to November 15, 1921. No explanation has been offered of why that company waited until the time had nearly expired for bidding before it notified the committee appointed to negotiate the sale, or any of the directors, that it desired or expected to bid on the stock. Except the request made by this company, not a single person, stockholder, firm, corporation, prospective purchaser, or any one else made known to this court or board of directors that he or it desired to bid and required more time for investigation in order to be sufficiently informed

to make an adequate bid. And not even now is such complaint being made by any one except petitioners, who own less than one-thousandth of the stock of the Railroad Company and the expense of litigating this complaint is being paid by an unsuccessful bidder.

Essential information, it is charged, was withheld and refused by the committee in charge of the sale. This is likewise in dispute, with one exception, to be later noted. It is charged that information was refused as to the balance sheet of July 31, 1921, earnings and changes in the balance sheet since July 31, 1921, and detailed labor costs per colliery. Mr. John Hood, Jr., expert engineer for the Lehigh Coal & Navigation Company, testified that he was not permitted to have the balance sheet of July 31, 1921; that is, he was not allowed to have it in his hands. However, according to his own statement, he did not ask for any other book, because he assumed, since he was not allowed the balance sheet, that information contained in other books would be denied him. This is flatly denied by Messrs. Johnson and Clarke, of the Coal Company, who say that the books were open on the table in front of Mr. Hood and his associates, and that "they had the balance sheet in their hands, and they asked questions about it." Similarly the petitioners say that the experts of the Navigation Company were refused information of the earnings and changes in the balance sheet subsequent to July 31, 1921. This is again denied by the officers of the Coal Company. It is admitted, however, that detailed labor costs per colliery were not given to the experts of the Navigation Company, because this information was not essential, had been refused to others, and would have opened up endless other questions on account of different costs in the various eleven collieries. The officers of the Coal Company earnestly urge that, with this exception, they with great labor furnished all the information asked for by the experts of the Navigation Company, who had come to Wilkes-Barre to make the investigation, and that, before leaving, Mr. E. M. Reynolds came and thanked them for the courteous treatment they had received, saying that they had gotten all they desired, except the detailed labor costs per colliery, which they did not have time to utilize. Besides the denial of the facts themselves, the experts of the respondent maintain that the information alleged to have been refused is really of no practical value or importance over and above what the Navigation Company already had.

Without resolving the truth of these issues of fact, we are convinced that their importance has been magnified since the sale. The Lehigh Coal & Navigation Company's expert, Mr. Norris, in his report to Mr. Warriner, of that company, said:

"From information I have, and from conversations with Mr. Huber, I am satisfied that the result of necessary changes will be to maintain essentially the same base of average cost, high and low cost changing about in proportion to their present conditions; if anything, the future output on a 5,000,000-ton basis will be at a slightly less average cost for similar conditions than in the past."

It is claimed that, through the possession of this information by Mr. Huber, who became associated with the Reynolds Syndicate, the Lehigh Coal & Navigation Company and other bidders were not able to bid accurately and intelligently, and that a disadvantage resulted to

them, and a corresponding advantage to the Reynolds Syndicate. Mr. Reynolds testified that he himself made up the Reynolds Syndicate bid, which was based on the same information that the other bidders had. The evidence does not show that Mr. Huber had anything whatever to do with the Reynolds bid. It is striking that the values placed on the property by the five bidders were so close, when the bids were secret, and no one knew how much the others bid. The figures before the directors on November 17, 1921, the date the Reynolds bid was accepted, show that the difference between the bids of the Reynolds Syndicate and the Lehigh Coal & Navigation Company, the next highest bidder, was less than $250,000 in a property concededly worth $32,-000,000. The difference between their bids is only a little more than seven-tenths of 1 per cent. of the admitted value of the stock. When the closeness of the bids is considered, it is practically inconceivable that the Reynolds bid was made with full and accurate information, and the others were made without "essential information," and were more or less a guess.

The petitioners contend that the sale was not carried out in good faith, and is not a bona fide sale, because of the association of Jackson E. Reynolds with the directors of the Railroad Company, on the one hand, and with Mr. Charles F. Huber, the president of the Coal Company, on the other. Unless the sale was attended by collusion or corruption, neither previous nor present association invalidates it. At the meeting of the directors held November 2, 1921, Mr. Jackson E. Reynolds, the promotor of the syndicate bearing his name, was called in, and among other things was asked, "What about the traffic?" meaning, Would the coal be shipped over the lines of the Railroad Company, if his offer was accepted? He expressed surprise at the question, and bluntly refused to make any statement about it. If there had been an understanding between them, the question would not have been asked. The subject was never again mentioned to him or any person interested in the purchase. Mr. Reynolds was formerly associated with the directors of the Railroad Company and presently with Mr. Huber in the Coal Company. His method of distribution of the stock among the coal-operating management, distributors and large dealers, local capital affecting taxation and friends, strikes us as not unwise. This method of distribution and the personnel of the Syndicate were entirely his own selection. His method of distribution of the stock was responsible for his selection of Mr. Huber. He testified that he never saw any account of cost of production by collieries. Brown Bros. and the Massachusetts Gas Company received all the information they desired or asked for. Mr. Reynolds was asked to attend the meeting of the directors for a time after he resigned as director to furnish information which he alone possessed concerning the legal affairs of the Railroad Company. "For a similar purpose" he attended the meetings of the board of directors of the Reading Company. It is undisputed, however, that he took no part in the negotiations or transactions of the business of the board of the Railroad Company, except to give information for which he was asked. No collusive significance, in our judgment, can under the evidence be attached to this fact.

The burden of establishing that the sale of the stock was not made in good faith, for its fair market value, to the highest bidder, was upon the petitioners, and in our opinion they have not borne that burden. We are satisfied that in the opinion of the committee and the directors of the Railroad Company they sold the property for its fair market value at the time and under the circumstances to the highest and most "satisfactory" bidder. Accordingly the petition is dismissed, with costs.