The gist of this action, briefly stated, is a violation of the trust duty owed by a majority of the board of directors, who are as well the owners of a majority of the stock of the Mary A. Riddle Company, to the minority stockholders of the said company. The prayer is for the appointment of a receiver and an accounting by said majority stockholders. The corporation is admittedly solvent. Originally, the application was made for a custodial receiver and a preliminary restraint, which application was denied. See Riddle v. Mary A. Riddle Co., 140 N.J. Eq. 315;54 Atl. Rep. 2d 607.
Complainants are not now pressing for the appointment of a receiver and have, as a matter of fact, discarded that application. They do, however, demand an accounting and a repayment or restoration to the corporation of funds of which it was illegally deprived, predicated upon an alleged violation of the duty owed to the complainants as minority stockholders by the individual defendants as officers of and as a majority of the board of directors of the Mary A. Riddle Company, in the following respects: (1) by payment of excessive salaries to Florence M. Riddle, Hugh Riddle and Bruce Riddle, which *Page 149 
excess would otherwise have been available for the payment of dividends to complainants; (2) by improper and illegal financial dealings between the Mary A. Riddle Company and the Eden Company, in which latter company the individual defendants herein are alleged to hold a controlling and dominating interest, to the detriment of the Mary A. Riddle Company; (3) by the diversion of assets of the Mary A. Riddle Company for the personal advantage of Hugh Riddle, the vice-president and treasurer; (4) by the dealings of Hugh Riddle, the vice-president and treasurer, in stock of the Atlantic City Fire Insurance Company to the disadvantage of the Mary A. Riddle Company.
The Mary A. Riddle Company is practically a closed family corporation, having been organized by William Riddle, the deceased husband of Florence M. Riddle and the father of the complainants Donald Riddle and Graeme Riddle and of the defendants Hugh Riddle and Bruce Riddle. Initially and originally the corporation was organized for the purpose of holding title to and managing real estate purchased by William Riddle and other investments purchased and made by him.
There are presently issued and outstanding 2,000 shares of the authorized capital stock structure of the par value of $1,000 each. Of the shares of stock issued and outstanding, the complainants Donald Riddle and Graeme Riddle own a total of 816 shares and the three individual defendants, Florence M. Riddle, Hugh Riddle and Bruce Riddle, own a total of 1,172 shares. The balance of the stock issued and outstanding is owned by five individuals, no one of whom owns more than three shares of stock and no one of whom participated in these proceedings. It is apparent, therefore, that the complainants own approximately 40% of the stock issued and outstanding and that Florence M. Riddle, Hugh Riddle and Bruce Riddle own approximately 60% of the stock. For the sake of convenience, they will be herein considered as owning such respective proportionate shares. The five Riddles, together with Isabel Sickler, owner of three shares of stock, constitute the board of directors of the defendant corporation. The officers of the corporation are *Page 150 
Florence M. Riddle, president; Hugh Riddle, vice-president and treasurer; Isabel Sickler, vice-president; Bruce Riddle, secretary; Donald Riddle, assistant secretary, and Graeme Riddle, assistant treasurer.
It is generally recognized in this State that so long as the directors of a corporation exercise their judgment upon questions of policy or management honestly and sincerely that this court is without authority to substitute its judgment as to the advisability of a proposed course of action for the judgment of the board of direcors.
 In Ellerman v. Chicago Junction Railways, c., Co., 49 N.J. Eq. 217; 23 Atl. Rep. 287, the court said as follows:
"Individual stockholders cannot question, in judicial proceedings, the corporate acts of directors, if the same are within the powers of the corporation, and, in furtherance of its purposes, are not unlawful or against good morals, and are done in good faith and in the exercise of an honest judgment. Questions of policy of management, of expediency of contracts or action, of adequacy of consideration not grossly disproportionate, of lawful appropriation of corporate funds to advance corporate interests, are left solely to the honest decision of the directors if their powers are without limitation and free from restraint. To hold otherwise would be to substitute the judgment and discretion of others in the place of those determined on by the scheme of incorporation."
See, also, Merriman v. National Zinc Corp., 82 N.J. Eq. 493;89 Atl. Rep. 764; Farmers Loan and Trust Co. v. Hewitt, 94 N.J. Eq. 65; 118 Atl. Rep. 267; Kelly v. Kelly-Springfield Tire Co.,106 N.J. Eq. 545; 152 Atl. Rep. 166; Madsen v. Burns Bros.,108 N.J. Eq. 275; 155 Atl. Rep. 28; Ace Bus Trans. Co. v. SouthHudson, c., Association, 118 N.J. Eq. 31; 177 Atl. Rep. 360.
In Laredef Corp. v. Federal Seaboard Terra Cotta Corp.,131 N.J. Eq. 368; 25 Atl. Rep. 2d 433, the court aptly expressed the restriction upon interfering with the internal government of a corporation, as follows:
"The corporation is perfectly solvent and the authority of the directors when exercised in good faith and within the law should be regarded as absolute. It is a well settled rule of *Page 151 
law that questions of business policy devolve upon the officers and directors who are elected by the stockholders for the precise purpose of determining such problems. It is peculiarly their duty and prerogative to evaluate the business outlook, and while the court may not be as sanguine as they, the substitution of its judgment for that of the chosen managers of the business is not justified in the circumstances here disclosed."
Although officers and directors of a corporation bear a fiduciary relationship to its stockholders (Whitfield v. Kern,120 N.J. Eq. 115; 184 Atl. Rep. 333; Marr v. Marr, 73 N.J. Eq. 643; 70 Atl. Rep. 375; Stewart v. Lehigh Valley Railroad Co.,38 N.J. Law 505), they are entitled to be compensated not only for services which they render as such officers but also for additional services which they render as agents or servants of a corporation. Hewson v. Charles P. Gillen Co.,142 Atl. Rep. 250. There is no doubt, however, that this court has the right to investigate the reasonableness of such salaries paid to officers upon a presentation of the proper facts, and when such salaries are properly called in question the burden of establishing the value thereof is upon the persons receiving the same.
In Lillard v. Oil, Paint and Drug Co., 70 N.J. Eq. 197;56 Atl. Rep. 254, the court said (at p. 204), as follows:
"It is settled in this State beyond question that where the salary of the president or of any other member of the board of directors, for his personal services in the general management of the business of a company of this character, is fixed by the directors, the amount of compensation fixed by the board is not final as against any dissentient stockholder promptly applying for relief. The mere employment of a director to perform the services is not reviewable to any greater extent than any other act of the board in managing the business of the corporation under the statute, but the agreement for employment is in such cases considered as distinct and separable from the agreement for compensation, and the compensation, when properly called in question, is determined by the court, at its fair value, and the burden of establishing the value of their services is upon the directors." *Page 152 
See, also, Gardner v. Butler, 30 N.J. Eq. 702; Raynolds v.Diamond Mills Paper Co., 69 N.J. Eq. 299; 60 Atl. Rep. 941;Blancard v. Blancard Co., 96 N.J. Eq. 264;125 Atl. Rep. 337.
A mere delay in bringing an action contesting the payment of salaries may well result in a stockholder being barred from the relief for which he prays. In Lillard v. Oil, Paint and DrugCo., supra, the court said as follows (at p. 210):
"Promptness in a stockholder's application for relief in a case of this kind is one of the essential conditions on which it is granted, and the question in each case is as to the application of the rule."
And again (at p. 211):
"So far as relates to the salary paid each year, the stockholder may be barred from relief, if he delays beyond the year, and allows the company to pay the salaries, and the delay is not satisfactorily explained."
See Raynolds v. Diamond Mills Paper Co., supra; Costello v.Thomas Cusack Co., 96 N.J. Eq. 95; 124 Atl. Rep. 620.
The rule is different, being based upon a different theory of the law, where the action is brought by the receiver of an insolvent corporation. See Hayes v. Pierson,45 Atl. Rep. 1091; Davis v. Thomas Davis Co., 63 N.J. Eq. 572;52 Atl. Rep. 717. The present action is a suit by two minority stockholders against the actions of the directors, and the delay in bringing the action, or the affirmative approval of the action, may mitigate against them.
It is admitted that the acts complained of are within the powers of the corporation. For the complainants to succeed, therefore, it must be demonstrated that the acts are in furtherance of purposes which are unlawful, against good morals, or not done in good faith and in the exercise of honest judgment. The factual situation as disclosed at the final hearing must, therefore, be examined to determine where the merits lie.
In 1924 Hugh Riddle then having recently graduated from Rensselaer Polytechnic Institute as a civil engineer, was persuaded by his father, William Riddle, the motivating spirit of the Mary A. Riddle Company, to become associated with him in the conduct and management of the business of said *Page 153 
corporation. At the time of the death of William Riddle in 1928 he was receiving a salary of $16,000 per annum as president of the corporation and Hugh Riddle was receiving a salary of $6,000 per annum from the same source. At the time of the death of William Riddle there were issued and outstanding some 3,000 shares of stock, of which he bequeathed 360 shares to Hugh Riddle, Bruce Riddle and Graeme Riddle. One thousand five hundred and nine shares had been theretofore assigned to a trustee under a deed of trust, which was subsequently declared illegal and the title to these shares vested in the four brothers now before the court. Donald Riddle apparently was cut out of his father's will, for the reason that his private business undertakings had been unsatisfactory, necessitating financial assistance from his father, and for the further reason that while he had been associated with his father for some time in the Mary A. Riddle Company, the father became dissatisfied with his business conduct. Thereafter, Hugh Riddle, Bruce Riddle and Graeme Riddle, in order to make certain that each of the brothers should participate to an equal extent in the estate, each assigned one-quarter of the shares of stock inherited by them from their father to Donald Riddle. This resulted in the practical division of the 360 shares into holdings of 90 shares each by Hugh, Bruce, Graeme and Donald Riddle.
The assets of the corporation presently consist principally of two parcels of real estate situate in the City of Atlantic City, commonly known as the Riddle Block at Pennsylvania Avenue on the Boardwalk, with the Steeplechase Pier on the opposite side of the Boardwalk, and the property at Nos. 7 to 15, inclusive, South Tennessee Avenue, Atlantic City. These assets have a present book value, before depreciation, of upwards of $900,000. The assets over the years consisted as well of other parcels of real estate, stocks, bonds and mortgages.
In 1928 the corporate indebtedness amounted to $624,947.10. This indebtedness was reduced to $121,500 in 1946 before the construction of the buildings at 7 to 15 South Tennessee Avenue, which will hereafter be discussed. *Page 154 
Upon the death of William Riddle, and consistent with his expressed desire, Florence M. Riddle became president of the corporation at a salary of $12,000 per annum and Hugh Riddle continued in his capacity as secretary at a salary of $6,000 per annum.
With the ravages of the depression succeeding 1929 and the bank holiday of 1933 it became evident that the income of the corporation was rapidly decreasing and the problem of future income was undetermined and unpredictable. In this state of affairs Florence M. Riddle and Hugh Riddle voluntarily accepted a reduction of 50% in their salaries, thereafter receiving $6,000 and $3,000, respectively.
As was admitted by Donald Riddle on the witness stand, and counsel for complainants in his argument, Florence M. Riddle has always been a keen and intelligent business woman and over the years has devoted a considerable part of each day to the business and affairs of the corporation. It is apparent from the testimony that she became the matriarch of the Riddle family upon her husband's death, and for some years, especially with the aid and assistance of her eldest son Hugh Riddle, managed and operated the business and concerns of the corporation. As she advanced in years Hugh Riddle assumed more and more the guidance of the corporation.
Complainants object to the "dominating" influence of Hugh Riddle in the affairs of the corporation. If this alleged domination by Hugh Riddle was illegally or improperly exercised to his own advantage and not to the advantage of the stockholders of the corporation, they have a just complaint. On the other hand, if he was prompted by honest and sincere motives they have no cause for complaint. It is self-evident that in any group, whether it be civil, political or industrial, one man or a small group of men, through force of personality, intelligence and initiative, will always become the dominating factor of such group.
Without encumbering this opinion with detailed recitals of the skill or ingenuity required to handle, manage and manipulate the affairs of the corporation in order to weather the recent depression and finally show a profit upon its investments, *Page 155 
a brief reference to several incidents might be appropriate. Reference is here made to the refunding of the Penn-Mutual Life Insurance Company mortgage; the refinancing of the Philadelphia National Bank loans; the borrowing from Charles C. Babcock; the refinancing of the corporate obligations held by the Reconstruction Finance Corporation; the refinancing through the Equitable Life Assurance Society mortgage; the timely sale of the Guarantee Trust Company stock; the negotiations and transactions with Clarence Busch; the timely sale of the Albany Avenue real estate; the sale of the Knife and Fork Inn at the price realized; the management and ultimate liquidation of the Atlantic City Fire Insurance Company.
It is a well-recognized fact that during the vicissitudes of the depression which had its inception in the stock market crash of 1929 and continued for some years thereafter, innumerable fortunes were wiped out and many of our citizens who were regarded as financially independent in 1929 became practically paupers within five years. During these depression years there was very little if any sale for real estate, especially in Atlantic City. As a result of the poor business conditions rentals were either reduced or properties remained vacant. It is apparent, therefore, that during these years someone performed a remarkable service for the corporation, not only in saving its assets but also in succeeding in placing it in the wholesome financial condition in which it was found in 1946.
In connection with the amount of salaries received, objection is made by the complainants to the effect that in addition to the salaries paid to Florence M. Riddle, Hugh Riddle and Bruce Riddle, salaries are paid to stenographers, bookkeepers, janitors and rent collectors. Apparently no credit is given for the brains, ingenuity and the mental skill required over the years in managing and operating this business. What we have recently come to class as "know-how" is depreciated. It seems to be felt by the complainants that the officers should perform the mechanical acts of bookkeepers, stenographers, janitors and rent collectors as well as the supervisory acts of executives. Such a suggestion is absurd. During all of the *Page 156 
years that the mother and the four brothers received salaries as officers, employees, servants or agents of the corporation, it is admitted that Donald and Graeme Riddle performed no services whatsoever for the corporation except as directors, for which, incidently, they received the same directors' fees as the defendants, their mother and brothers. It must also be borne in mind that in the business of a corporation having assets of the type of the Mary A. Riddle Company not only must the managers or guiding spirits have sound business judgment in the maintenance, improvement and operation of its real estate and the investment and control of its other assets, but they must, in the interest of all the stockholders, so conduct the corporate business as to make it as little liable to taxes under the Internal Revenue law as that law permits. This in itself is no mean feat to accomplish. The testimony disclosed careful consideration of this problem by the individual defendants, resulting in the maximum possible net profit to the corporation.
The testimony of the real estate experts as to the costs for collecting the rents from the tenants of the Riddle Block and Steeplechase Pier is not such as to prove any misconduct on the part of the defendants. H.G. Meyers was not conversant with all the duties and services required to be performed as a rental agent. Neither he nor Myer Saul demonstrated any drastic saving in the compensation they set for the services they would render which would show an unconscionable salary paid to Bruce Riddle.
It is to be noted that Graeme Riddle did not himself at any time take the stand and testify. The minutes disclose that Graeme Riddle attended every annual meeting of the stockholders and the initial meetings of the board of directors from 1937 to 1947, except in 1945. Donald Riddle, on the other hand, attended only the following annual meetings of stockholders and annual initial meetings of the board of directors from 1934 to 1947, i.e., 1934, 1935, 1941, 1942, 1946 and 1947. At no time did either of them make any formal protest or objection to the salaries established for the officers of the corporation at these several initial directors' *Page 157 
meetings. On the contrary, in each of the years when they were present at said meetings they voted affirmatively for the salaries as established. The sole official suggestion for a reduction was made in June, 1940, by Graeme Riddle, at which time further consideration was postponed until the October meeting of the board. At the meeting of October, 1940, Graeme voted in favor of the suggested salaries, apparently withdrawing his initial suggestion for a reduction. There is no dispute of the accuracy of the vote as recorded in the minutes. The excuse, however, for not having made any formal objection is now advanced by the statement of Donald Riddle that it was needless, since his mother and his brothers Hugh and Bruce owned a controlling share of the stock and were a majority of the board of directors, and believing that the majority ruled, he was without any remedy. I am not too impressed by this excuse.
Not only have these complainants delayed in bringing any action in an attempt to have the salaries heretofore authorized declared excessive, but they have actually acquiesced in the establishment of the same by formally voting in the affirmative at the several meetings where the amount of the salaries was determined.
As above stated, we have here not only a situation in which the minority stockholders, who were also directors, have delayed in bringing any action, but we find them as well in the anomalous position of having voted affirmatively for the salaries as established at every meeting they attended, except in the year 1947. In view of the complainants' failure to satisfactorily explain the delay in bringing this action, and in the further view of their affirmative vote upon the salaries as established the complainants herein are barred from complaining about the alleged excessive amounts withdrawn prior to the year 1947. In addition, Florence M. Riddle, Hugh Riddle and Bruce Riddle bore the burden of establishing that the services rendered by them as officers, agents or servants of the corporation were of such a value as to entitle them to the reasonable salaries they received over the years until 1947. For these reasons, the defendants will not be directed to make *Page 158 
any restoration or repayments of salaries received prior to 1947.
In so far as the salaries for 1947 are concerned, there has been no testimony that the work involved was any less laborious nor was there any less skill required in the management of the affairs of the company than was required in the years 1941 through 1946. As a matter of fact, the construction of the buildings at 7 to 15 South Tennessee Avenue placed additional responsibilities upon the management. Therefore, if the salaries as established for those several years, not only without objection but, as has been above noted, with the affirmative approval and consent of the complainants, were, as we have held, reasonable considering the services rendered, we must conclude that the sole amount actually in controversy is the increase authorized for the year 1947.
The salaries which Florence M. Riddle, Hugh Riddle and Bruce Riddle were allowed by vote of the board of directors, including complainants' vote, in 1946, were $6,600 each, which were increased to $9,000 each in 1947. The complainants received salaries of $820 each in 1946, which were increased to $1,200 in 1947.
The gravamen of the complaint here is that by the payment of these salaries the defendants were deprived of a reasonable share of the earnings of the corporation.
Donald Riddle testified that he would voluntarily agree and actually preferred to receive no salary, but desired to receive whatever profit there was in the form of dividends, admitting that he had performed no needful services as an agent or servant of the corporation, but that such services as he rendered were rendered at monthly directors' meetings, for which he had received directors' fees. He complained that at these meetings all of the preliminary planning of propositions submitted had been done by the majority and all that he did was to approve or disapprove suggested policies. Graeme, of course, as has been above noted, did not testify at all.
It may well be that Donald Riddle has not sat down with pencil and paper and mathematically computed the result of his suggestion. We presume that the suggestion contemplates *Page 159 
that the salaries as established in the year 1946 were reasonable, and we might say in passing that the mother and the two brothers of the complainants who are receiving these salaries could not be expected to render their services as active managers without financial remuneration, especially in view of the failure of complainants to render any such service.
Because of the earnings of the corporation, it was, for the year 1947, in the 38% income tax bracket, and if the salaries complained of were disallowed, any dividend paid as a result of such economy would amount, of course, to only 62% of the total saved. If this court should determine that all increases authorized for the year 1947 to both complainants and defendants were improperly or illegally paid, the following demonstrates what would happen under the above set forth hypothesis:
1947 — Florence M. Hugh Bruce Donald Graeme
Total salary
 bonus and
 dividend
 actually
 received ........ $16,000.00 $16,550.00 $14,580.00 $8,780.00 $8,780.00
Result of
 disallowance
 of all
 salary
 increases
 authorized in
 1947 ............ -1,660.96 -1,660.96 +439.04 +359.04 +359.04
 _________ _________ _______ _______ _______
Net resulting
 dividend and
 salaries ........ $14,339.04 $14,889.04 $15,019.04 $9,139.04 $9,139.04

Again, if we should accept Donald's theory at its face and disallow any salary paid to him or Graeme, it follows that any bonuses paid them must likewise be disallowed. By disallowing the increase in salaries and bonuses paid to Florence M., Hugh and Bruce for the year 1947 and any salaries or bonuses paid to Donald and Graeme for the year 1947, the following would result: *Page 160 

1947 — Florence M. Hugh Bruce Donald Graeme
Total salary
 bonus and
 dividend
 actually
 received ......... $16,000.00 $16,550.00 $14,580.00 $8,780.00 $8,780.00
Result of
 disallowance
 of all
 salary
 increases
 to individual
 defendants and
 salary and
 bonuses to
 complainants ..... -2,787.60 -2,787.60 -787.60 -1,588.60 -1,588.60
 _________ _________ _______ _________ _________
Net resulting
 dividend and
 salaries ......... $13,212.40 $13,762.40 $13,792.40 $7,191.40 $7,191.40

If all salaries and bonuses were disallowed, as has been suggested by complainants, there would be additional earnings of $44,900, of which 62% or $27,838 would be available for additional dividends. The net to complainants would be $5,567.60.
It is immediately apparent that under the first above set forth situation Donald and Graeme would receive an increase in the amount of $359.04 each above what they actually did receive in 1947, and under the second, that they each would receive $1,588.60 less than what they actually received for the year 1947. Under the third, without paying any salaries, the increase return to complainants above the $4,700 of salary and bonus received by way of dividend alone would be $867.60. How, in this latter contingency, anyone would be expected to spend time and effort in working for the corporation is not suggested by complainants.
The salaries which Donald and Graeme were voted for 1947 were $1,200 per annum. In addition to the salaries, the mother and the four brothers were annually voted a bonus in equal amounts from the year 1936 to the year 1947, with the exception of the year 1940, when Bruce received $150 more than the others, and the year 1944, when Florence M. and Hugh each received $475 more than the others. For the year 1945 the bonus amounted to $2,500 each and in the years 1946 and 1947 $3,500 each. The total received by each of *Page 161 
the five by way of salary, bonus and dividend for the five year period of 1943 to date was as follows: Florence M., $57,529.08; Hugh $57,644.08; Bruce, $47,108.74; Donald, $27,932.08; Graeme, $27,932.08.
This demonstrates that over this five-year period the three defendant officers received a total of $106,417.74 more than the complainants from the corporation. This figure includes payments for salary and bonus as well as dividends. The yearly average was, therefore, $21,283.55 which they received in excess of the payments made to complainants. When it is remembered that the salaries paid to the officers in 1928 were $22,000 per annum it cannot be said that this is an exorbitant amount to pay for the officers' services as servants or agents.
The foregoing figures further cast a serious doubt on the bonafides of these complainants. It must be remembered that this is not a corporation whose shares are generally owned by the public. It is practically a closed family corporation. The complainants do not come before this court as minority stockholders who have been mulcted of their just earnings. They have for years actively and passively consented and acquiesced in the payment of similar salaries to those of which they now complain. They have admittedly been paid salaries in large amounts for which they have rendered no appreciable service. The entire atmosphere, including the conduct of the witnesses, gives cause to speculate whether the action was not prompted and motivated by the conclusion of the majority to erect the building on South Tennessee Avenue.
It has been testified that the Internal Revenue Department has approved the expense item of the salaries and the bonuses of both complainants and defendants.
If I should accept the suggestion of the complainants and reduce the individual defendants to the 1946 salary and disallow any salary or bonus to complainants, or if the Internal Revenue Department should disallow complainants' salaries and bonuses, they would be in a far worse financial situation than they find themselves to-day.
The actual total salaries of Florence M., Hugh and Bruce are $25,000. The total salaries in 1928 were $22,000. There *Page 162 
is nothing before me to exhibit that there is anything which requires less judgment and skill in 1947 than was required in 1928.
A further factor which must be considered in reaching any conclusion as to the reasonableness of salaries paid in 1947 is the purchasing value of the dollar. Mr. Justice Minturn expressed this in Bowes v. Public Service Railway Co., 94 N.J. Law 378;110 Atl. Rep. 699, in the following language in 1920:
"At a period when the purchasing power of the dollar has in the language of the day been `cut in half,' the value of the sum awarded here is not to be estimated in the numerical quantum of the recompense, but in its comparative ability to furnish the necessities of life. Of these facts the court must take judicial notice."
What was there said is just as applicable to 1947. A comparison of the remuneration received by the officers over the years for services comparable to the year complained of leads to the conclusion that they are not unconscionably high.
In view of all the circumstances, I cannot say that the salaries paid to the three individual defendants were so excessive as to demonstrate that their salaries were unfair or unconscionable, particularly having in mind the net result in so far as the complainants are concerned. There is an absence of any proof of bad faith on the part of defendants. As a matter of fact, when the foregoing figures are analyzed the complainants are shown to have been the happy recipients of careful planning. I am satisfied that the defendants have borne the burden of proving the reasonableness of their compensation.
In so far as the alleged improper and illegal financial dealings between the Mary A. Riddle Company and the Eden Company are concerned, this would seem to be a question of business judgment which should be left to the sound discretion of the management of the corporation. The explanation as given by Hugh Riddle for the refunding of the outstanding obligations of the Mary A. Riddle Company and the borrowing of money from the Eden Company at a higher rate of interest, without the deposit of collateral which might later *Page 163 
be used for a further loan in the event of an unanticipated emergency, impresses me as showing that the action was conceived in good faith and with honest motives. As was stated in LaredefCorp. v. Federal Seaboard Terra Cotta Corp., supra, even though this court may not agree as to the business policy established by the board of directors, unless the action on the part of directors is prompted by a dishonest motive, to the detriment of some of the stockholders, the action will not be interfered with.
The third objection of the complainants, alleging a diversion of the assets of the corporation by Hugh Riddle, really finds its foundation in the construction of the stores and offices at 7 to 15 South Tennessee Avenue and the failure of Hugh Riddle to pay what the complainants conceive to be a fair rental for the privilege of using the office of the Mary A. Riddle Company for the conduct of his private business affairs. It might be said parenthetically that the construction of these stores seems to have motivated this action. The testimony concerning the leases already executed and the revenue anticipated to be received from this building would seem to justify the majority in having constructed the stores and offices. Again, this is a question of business judgment which should properly be left to the duly elected directors of the corporation.
I am also satisfied that the amount of rent agreed to be paid by Hugh Riddle for the use of a part of the office of the Mary A. Riddle Company is not so disproportionate as to demonstrate any fraudulent intent nor to exhibit a diversion of any of the assets of the corporation at the expense of the complainants.
The fourth objection concerns the stock of the Atlantic City Fire Insurance Company, some of which had, prior to 1939, been purchased by the Mary A. Riddle Company and which was thereafter purchased by Hugh Riddle on his own account. Nowhere is there any testimony demonstrating that Hugh Riddle was affirmatively directed to purchase stock of the Atlantic City Fire Insurance Company on the account of or for the benefit of the Mary A. Riddle Company. True, such purchases had been made between the years 1924 and *Page 164 
1939. The testimony of Hugh Riddle, however, which is uncontradicted, is that the directors of the Mary A. Riddle Company had determined in 1939 not to purchase further stock of the Atlantic City Fire Insurance Company. The theory of the complainants seems to be that because of the fact that Hugh Riddle had once purchased the Atlantic City Fire Insurance Company stock for the Mary A. Riddle Company he was therefore obligated to purchase such stock for the said Mary A. Riddle Company and not on his own behalf. The argument is advanced that because Hugh Riddle knew that the Atlantic City Fire Insurance Company stock had an actual value in excess of its market value, through his position in the Atlantic City Fire Insurance Company, that he was thereby barred from purchasing the same on his own account, and was obligated to purchase the same for the Mary A. Riddle Company. If we should follow the rationale of the argument to its logical conclusion we would foreclose him from ever making any private investment on his own account so long as there were available any funds for investment in the Mary A. Riddle Company. Under the facts as adduced, the complainants have failed to prove any violation of a duty owed to them by reason of his holding an office in said company.
The bill will be dismissed. *Page 165