Woodward v. Woodward.

JOSEPH WOODWARD

v.

MARY WOODWARD.

1. A husband who consents to the adultery of his wife is not entitled to a divorce.

2. And a husband who endeavors to procure his wife to be lured into the commission of adultery, will be regarded as consenting to all subsequent acts of adultery which she may commit.

3. The iniquity which deprives a suitor of a right to justice in a court of equity, is not general iniquitous conduct, unconnected with the matter in suit, but evil practice or wrongful conduct in the particular matter or transaction in respect to which judicial protection or redress is sought.

On final hearing on petition and answer, and proofs taken in open court.

*Mr. John A. Miller* and *Mr. William B. Guild, Jr.*, for petitioner.

*Mr. Paul W. Roder* and *Mr. Samuel Kalisch*, for defendant.

VAN FLEET, V. C.

This is a suit by a husband against his wife, for divorce on the ground of adultery. But a single question is presented for decision: Is adultery proved? Two adulterous acts are charged: one committed with a man by the name of Carr, on the 16th of March, 1885, and the other with the petitioner's own brother, on the 6th of January, 1886. The last was abandoned on the argument, not because the fact of illicit sexual intercourse was not proved, but because the proofs which established the wife's guilt demonstrated, with almost equal clearness, that the petitioner had procured her to be debauched. A husband who consents to the adultery of his wife cannot make her criminal act a ground of divorce. His consent bars his right to a decree of divorce. The

Woodward *v.* Woodward.

statute so declares. And a husband who endeavors to procure his wife to be lured into the commission of adultery will be regarded as consenting to all subsequent acts of adultery which she may commit, whether they be committed with the person selected by him, or with others. *Hedden* v. *Hedden, 6 C. E. Gr. 61; 2 Bish. on M. & D.* §§ *10, 11.*

The position in which the evidence places the petitioner before the court, is such as to induce the court to look both upon him and his case with strong suspicion and distrust. To get rid of his wife, the proofs show that he entered into a conspiracy with his own brother to have him debauch his wife. His conduct involved something more than a most cruel violation of conjugal duty—it involved a detestable crime, the ignominious dishonor of his wife, and the utter degradation of his brother and himself. Were the case one in which it would be proper to apply the maxim, "That he that hath committed iniquity shall not have equity," or, as it is sometimes rendered, "That he who comes into equity must come with clean hands," the court would thrust the petitioner from its doors promptly and sternly. But this maxim cannot be applied to the petitioner, if it be true that the defendant committed adultery on the 16th of March, 1885. If she was guilty of adultery on that day, her crime was purely the result of her own depraved nature. There is nothing in the evidence which will justify even a suspicion that up to that time a desire had found a place in the petitioner's heart that his wife might go astray. If, therefore, she did commit adultery on that day, her crime constituted a ground of divorce. Her criminal act gave her husband a right of action against her, of which nothing short of his voluntary surrender, or the commission by him of a matrimonial offence which entitled her to a divorce, could deprive him. The iniquity which deprives a suitor of a right to justice in a court of equity, is not general iniquitous conduct, unconnected with the act of the defendant which the complaining party states as his ground or cause of action, but it must be evil practice or wrongful conduct in the particular matter or transaction in respect to which judicial protection or redress is sought. *1 Pom. Eq. Jur.* § *399.* As already remarked, the petitioner

15

stands, so far as the adulterous act committed by the defendant on the 16th of March, 1885, is concerned, free from the least suspicion of complicity in it. There is no reason to doubt that, at that time, he desired his wife to be faithful to him, and to live a chaste life.

The proofs, I think, show that the defendant was guilty of adultery on the 16th of March, 1885. At that time the parties, as well as the defendant's paramour, resided in the city of Newark. There is no dispute that the defendant left her home on the evening of the day in question, about six o'clock, in company with Carr, to go to the house of James Stanley, nor that she was then drunk, nor that, two or three hours after leaving home, she appeared at the house of Stanley in a state of gross intoxication, in company with Carr. Carr was then the proprietor of a liquor saloon, located on Belleville avenue, which the defendant and he passed in going to Stanley's. Carr's bartender swears that the defendant came into the saloon with Carr on the evening in question, and that, shortly after they entered, Carr sent him away on an errand, and that he was absent over an hour, and when he returned the defendant was still there, but that she and Carr left together soon after he returned. Carr and the defendant both deny that she entered Carr's saloon, but they admit that they went to Stanley's together. Carr and the defendant both say that they were admitted to Stanley's house, while Stanley and his wife say that they invited the defendant in, and told her that if she would come in they would take care of her until the next morning, but that Carr could not come in, and that the defendant, in reply to their offer, said that if Carr could not come in she would not. Another person who was present says Carr did enter Stanley's house, but that Stanley at once ordered him to go out. Stanley swears that after the defendant and Carr left his house he followed them, and saw them go to Carr's saloon, and enter it, and that shortly thereafter he applied for admission, and was told that the saloon was closed for the night. The defendant and Carr say, on the contrary, that the defendant did not go to Carr's saloon that night, but that Carr took her from Stanley's house to a horse car, put her

Woodward *v.* Woodward.

in the car, and there left her. And the defendant says that from the point where Carr left her she went directly home to her husband's house, and applied for admission, but her husband refused to let her in, telling her to go away; that if she came in he would kill her. She says she then went to her father's house, and stayed there until the next morning.

The next morning she did not go home. She first went to Stanley's. She says she went there to apologize to Mrs. Stanley for going there the night before in a drunken condition. and also to get Mrs. Stanley to go home with her. Stanley and his wife say that when the defendant came there the next morning, she begged them to say nothing about what had occurred the night before, and not to tell her husband that she had been with Carr. Mrs. Stanley also says that the defendant told her that Carr had drugged her, and that if her husband knew what had occurred he would discard her, and she would be ruined. She did request Mrs. Stanley to go home with her, and she went. The defendant says her husband at first refused to receive her, but after he had had some conversation with Mrs. Stanley, which she did not hear, he let her in and received her kindly. Carr also called at Stanley's the next morning, and inquired what had become of the defendant, and whether her husband had taken her back. Carr denies this, but the fact that he was there is established by the oaths of three witnesses, and the object of his visit is proven by the evidence of Mrs. Stanley.

The defendant and Carr both deny that their relations have ever been criminal, but their denials are entitled to very little weight. Carr's evidence, besides being, in several important particulars, extremely improbable, is so strongly contradicted on material points by so great a volume of evidence as to render it utterly untrustworthy. One thing must be regarded as entirely certain: if the defendant was in Carr's saloon, with Carr, on the night in question, with the door locked, her guilt is established. Her denial, then, that she was there would furnish almost conclusive evidence that she was there for an adulterous purpose. Now, Stanley swears she was there. He says that he saw her go in with Carr, and that he afterwards applied for

admission and was refused. Two other persons saw them going towards Carr's saloon. The defendant at this time was sick from the effects of liquor—Carr says she was "in a kind of dazed condition;" it is certain she was drunk, almost to helplessness. Her condition appealed very strongly to Carr not to abandon her in the street, nor to leave her until he could place her in the custody of some one who would take care of her. He had been with her for more than three hours while she was drunk; he had gone with her to Stanley's, if his intentions were pure, without motive or reason, and stayed there all the time she remained, though he knew that the Stanleys suspected they were together for an improper purpose; when the Stanleys invited her to stay with them until the next morning, he did not urge or counsel her to accept—a thing he would have done eagerly if he had no further use for her, and wanted to get rid of her— but, notwithstanding her deplorable condition, notwithstanding the fact that she was so drunk as to be almost unconscious, he says, and she does too, that she refused the shelter and protection offered to her, and that he then took her to a horse-car and put her in it, and there left her. The statement is incredible, and I do not believe it. Their conduct shows that they wanted to remain together, at a time and under circumstances which it is impossible to understand or account for except on the theory that their desires towards each other were lascivious.

The proofs convince me that the defendant was in Carr's saloon, with Carr, with the door locked, on the night in question. The defendant says that she spent part of this night at her father's house. The proofs seem to show that her statement in that regard is true. Two witnesses, besides the defendant, swear that she was there. They say she came about eleven o'clock, but they do not pretend to fix the time she arrived from actual observation, but by an estimate made long subsequent. Scarcely any species of evidence is less reliable. Besides, in this case, a computation based on the defendant's condition and the distance which she says she traveled, taking the time which she and Carr fix as the hour she and he left Stanley's to be correct, will bring

the defendant to her father's house at a time much later than that which she and her witnesses fix.

The proofs convince me that the defendant committed adultery with Carr on the 16th of March, 1885, and therefore, in my judgment, for that cause, the petitioner is entitled to a decree dissolving his marriage with the defendant.