One phase of the bill in this cause was before this court, and was decided in a memorandum filed on October 9th, 1922, and in an additional memorandum, upon reargument, filed November 3d 1922. From the order then made an appeal was taken to the court of errors and appeals, which order was affirmed. Costello v.Thomas Cusack Company et al., 1 N.J. Adv. R. 314; 94 N.J. Eq. 423.
The cause came on to be heard on the residue of the bill.
Defendant Cusack Company sought again to amend the certificate of incorporation at a meeting held on May 5, 1923, changing the character of the stock in some respects, and, on supplemental bill, this was also enjoined without filing a memorandum.
The Cusack Company, on December 7th, 1922, filed an answer with a counter-claim, bringing in Mr. Logeman and others as defendants, whereupon, Mr. Logeman had himself added as a party complainant to the bill. In this testimony he says he knew nothing of the preparation of the suit by Costello until the subpoena was served, and the reason why he had himself added as a party complainant was because he was attacked in the counter-claim.
During the trial of the cause, on the application of complainants, an order was made allowing the bill to be amended in such fashion that it would stand as a bill under the statute for mismanagement, and praying an injunction and receiver, a copy of which amended bill is contained in the order. Afterwards, counsel desired to treat the form of bill contained in the order as an independent bill, and, after some discussion, withdrew his application to amend, stating that complainants would stand on the original bill filed.
The charges against the defendant company, contained in said bill, are practically as follows:
1. That Cusack has dominated and been able to maintain control of the policy of the company, and to maintain and operate the company for the benefit of himself and of the majority stockholders, to the detriment of the complainant *Page 97 
and the minority stockholders, by the payment of large and unwarranted salaries, commissions and bonuses, or additional compensation to all the named majority stockholders, who are directors; and it then proceeds to set out the salary paid to President Cusack. It also alleges that the company has been mismanaged and its earnings squandered, c.
2. That it has been the policy of Mr. Cusack and the majority stockholders and directors to increase and expand the business for the purpose of increasing the volume, whereby they might increase their compensation without regard to whether the extension was made upon a profitable basis, and refers to the $1,800,000 bond issue in the year 1918.
3. That it increased the amount of its loans at banks.
4. That it established a branch in New York City which has been conducted at a great loss.
5. That, for the purpose of obtaining control and monopoly of the business, it has formed a corporation known as "The National Outdoor Advertising Bureau," which is being managed at a loss.
6. That, for many years the Thomas Cusack Company had been receiving, in each year, a large volume of orders from Poster Advertising Company, Inc., George Enos Throop, Inc., Ivan B. Nordham Company and other solicitors, which, in the year 1920, amounted to more than a million dollars, and that for the purpose of obtaining a monopoly or control of the business in the United States, Mr. Cusack, in the year 1920, undertook to have the Cusack Company refuse to receive any further orders from said concerns, and refused to take such orders, amounting, in the year 1921, to about $1,500,000, the result of which created competition, to the great loss of the stockholders of the company.
7. That the company's books show a profit, for the year 1921, of about $500,000, while its published audit for the same year shows a profit of about $1,500,000, and that the difference arises from the auditors charging the cost of erecting and maintaining poster-boards, c., as a capital *Page 98 
asset, which method is erroneous. These auditors are Price, Waterhouse Company.
It is then charged that the Thomas Cusack Company has been and is now being conducted at a great loss, and greatly prejudicial to the interest of its creditors and stockholders, so that the business cannot be conducted with safety to the public and advantage to its stockholders. It then prays, among other things, for the ascertainment of the proper compensation of the defendants, and that they may be decreed to restore the excess above that sum; that the actual surplus, for the purpose of declaring dividends, be determined, and that the proper dividends be declared; that it may be restrained from exercising its privileges and franchises, c., and that a receiver be appointed.
Dealing with the first charge in the complainants' bill — Mr. Logeman became secretary and a director, as I recall it, in 1917, and voted with the majority on all these items, and was in perfect accord with the majority down to and including the meeting of May 25th, 1920, at which latter meeting the salary, bonus and traveling expenses of Mr. Cusack were fixed at the identical sums that the bill now complains against, with Mr. Logeman and his brother-in-law, Robbins, voting in the affirmative. This compensation was as follows: salary, $50,000; allowance for expenses, $10,000; bonus on net profits, ten per cent., the net profits to be determined on the company's method of accounting.
At this meeting of May 25th, 1920, the order of business was as follows: The compensation of the president was first fixed as above for salary, expenses and bonus; nine directors were then unanimously elected, and on both these resolutions Messrs. Logeman and Robbins voted in the affirmative. In the next resolution Mr. J.M. Loughlin was elected secretary. Mr. Robbins placed in nomination Mr. Logeman; the result being that sixteen votes were cast for Mr. Loughlin and two for Mr. Logeman. The salary of the treasurer, with traveling expenses and bonus, was thereupon fixed, Mr. Logeman and Mr. Robbins voting in the affirmative. Thereafter *Page 99 
Mr. Logeman and Mr. Robbins, for the first time, began to vote in the negative upon the resolutions offered.
At an adjourned meeting of the board of directors, held March 15th, 1921, Mr. Costello appears as a director instead of Mr. Robbins. At this meeting Mr. Cusack was elected president, Mr. Costello voting in the affirmative, Mr. Logeman in the negative. On the vote for Mr. Read as treasurer, Mr. Costello voted in the affirmative and Mr. Logeman in the negative. The same may be said of the vote for Mr. Loughlin as secretary. At this meeting the salary, bonus and traveling expenses of the president were fixed at the sums above stated in the bill, namely, $50,000 salary, $10,000 for traveling expenses, and a bonus of ten per cent. of the net profits, "to be determined in accordance with the system of accounting that has been and is now being followed by the company." On this resolution Mr. Costello voted in the affirmative and Mr. Logeman in the negative. Mr. Cusack did not vote. Sixteen out of eighteen directors present voted in the affirmative. The salary of the treasurer was fixed at $6,000, $4,000 for traveling expenses, and a bonus of two per cent., being the same as the previous year. Sixteen voted in the affirmative, including Mr. Costello, and Mr. Logeman voted in the negative. The compensation of the secretary was fixed at the same figure as the preceding year, namely, salary $6,000, traveling expenses $2,500, and one per cent. bonus. Mr. Costello voted for this resolution, Mr. Logeman in the negative. In fixing the salary of Mr. Spriggs at $1,820 a year, in addition to a bonus of one per cent., Messrs. Costello and Logeman both voted for the resolution. The same may be said of the salary of Mr. O'Mara.
At the meeting of the board of directors, held March 28th, 1922, both Costello and Logeman voted against Mr. Cusack for president. The minutes of this meeting show the following statement by Mr. Logeman —
"I voted `No,' not on account of the personal villification and attacks that he has made on my character, but on account of his illegal acts and his continued actions that would tend to destroy the value of the interests that I, and the stockholders who have elected me a director, have in the company." *Page 100 
Not only did Mr. Logeman vote for all these alleged extravagances in the payment of salaries, bonuses, c., before the breach came, and Mr. Costello, in 1921, voted in the same fashion prior to his retaining Mr. Lutkin, but the great weight of the testimony is that the compensation fixed by the board of directors was reasonable and the method proper, and I do not recall any evidence on the part of the complainants to the contrary.
2. Turning to the second point made by the bill, as to the increasing and expanding of the business, and referring to the $1,800,000 bond issue in the year 1918: At a meeting of the board of directors, held on the 28th day of February, 1918, to consider this issue of $1,800,000 of bonds, there were present, among other directors, Messrs. Logeman and Robbins, and the resolution to issue the bonds was adopted by the unanimous vote of the directors of the corporation present. Following this a stockholders' meeting was held, on March 20th, 1918, upon due notice, stating the purposes of the meeting and referring to the $1,800,000 bond issue. Thus the stockholders were fully advised of the object of the meeting. At this meeting Mr. Read held the proxies of Messrs. Costello, Robbins and Logeman. Mr. Hopkins acted as secretary of the meeting, and the resolution to issue the bonds was unanimously adopted by the stockholders, casting sixty-six thousand and nine and one-half votes in favor of the resolution and none against. Thereafter, on the 22d of March, 1918, Mr. Logeman, as secretary of the company, made his certificate of the passage of said resolution, and that no part of the action taken at said meeting has been revoked or rescinded, and swore to the same. It is therefore apparent that this resolution was adopted unanimously by the directors and stockholders, with the full approval of Messrs. Logeman, Robbins and Costello. It seems rather strange, at this late date, when the complainants are now at swords points with the defendants, that the court would listen to the complainants' charge that either Mr. Cusack or the company had ulterior motives in the issuance of these bonds after they had actually approved of the action. *Page 101 
Touching the question of expansion at the meeting of the directors, held February 25th, 1918, after action on the bond issue was taken, it was resolved to close with Brook, of Brooklyn, the Interborough Company and Solomon Company, on the terms as read by Mr. Yerkes. (Purchase of plants.) Another resolution was passed that $100,000 be authorized for the expenditure in the construction of the new building to be located at Twenty-fifth street, Broadway and Fifth avenue, New York City, $50,000 of this amount to be taken from the bond issue. These resolutions were unanimously adopted, Mr. Logeman and Mr. Robbins both voting in the affirmative. Another resolution was unanimously adopted, after considerable discussion, that Mr. Yerkes and Mr. Ruch renew the negotiations with Mr. Buchholtz, of Hartford, Conn., and close with him as near the terms of the original agreement as possible. Other resolutions of a similar nature, to negotiate with Mr. Seymour, of Springfield, Mass., and with Messrs. Flynn and Kimball, of New England, were introduced, which were unanimously adopted, Messrs. Logeman and Robbins voting in the affirmative, and so far as I have been able to observe from the testimony, in no single instance, prior to the breach between Logeman and Cusack, did Mr. Logeman vote against expansion; nor did Mr. Costello, prior to retaining Mr. Lutkin, object to expansion whenever the question arose. And this expansion was in no manner objected to by anyone, so far as I recall the testimony, until the filing of the bill, and I am satisfied, from the evidence, that the business was conducted on a profitable basis, and that more profits would have been realized had it not been for the activities of Messrs. Logeman and Robbins, while Mr. Logeman was in the board of directors, seeking to take from the American Poster Service the business of that company, which was a subsidiary of the Cusack Company.
3. The third point is that they made increased loans from the banks. This I regard as proper, and was made necessary by this very expansion which I have found to be legal and proper, and which met with the approval of all concerned, *Page 102 
because the net profits, naturally, would be insufficient to take care of the expansion. To illustrate: If a sign cost $9,000 to erect, and it was rented at $12,000, payable in monthly payments of $1,000 each, it would take nine months' payments before the original outlay was paid. In the meantime, the company should have in hand the moneys to pay for the erection. The only other course to be resorted to would be to stop expanding, or borrow money for the purpose, which would permit the payment of cash dividends on the common stock.
4. The fourth point is that the Cusack Company established a branch in New York City, which has been conducted at a great loss. This is one of the things that created the friction between the Poster Advertising Company and others, whom I regard as being behind this bill — at least, as to Mr. Costello. As I recall the evidence, the Gude Company, in New York City, had allowed its plant to run down and deteriorate, to the detriment of all outdoor advertisers. This being unattractive, it would injure outdoor advertising in all parts of the country, because it would not attract the great advertisers in New York City to use this medium of advertising. Mr. Cusack desired the Gude Company to improve its various plants and make them attractive for the general benefit of all outdoor advertisers, and this not being done, the Cusack Company came into the city and spent a great deal of money in putting up plants which were very attractive, and, the first few years, lost money on the new enterprise, which might be expected; but later on the plants were beginning to pay, and, as I understand it, in this so-called loss, following the Cusack plan of bookkeeping, a great deal of the construction is charged up to expense and maintenance. I am satisfied that this move of the company was honestly conceived and honestly executed, and that it represented the best judgment of the board of directors. Some men might think otherwise, but to them was not committed the management of this corporation by the stockholders — it was committed to the directors; and if I should entertain a different opinion on the subject, it is not likely *Page 103 
that I could, in law or in equity, substitute my judgment for that of the directors.
5. As to the fifth charge above mentioned, I understand counsel have abandoned all reference to the National Outdoor Advertising Bureau.
6. The sixth charge will be dealt with hereafter.
7. The seventh point deals with the question of bookkeeping — the difference between what the balance sheets of the company showed and those of Price, Waterhouse Company. The two methods are perfectly plain to me. Price, Waterhouse Company pursued the scientific methods of bookkeeping and accountancy, whereas the Thomas Cusack Company used a different method upon which their bonuses were based. Under the Price-Waterhouse system, for the purpose of ascertaining the net income during the year, the expense of running the business was deducted from the gross receipts and the balance was regarded as net profits. Under the Cusack method practically all moneys expended during the year, whether on account of the ordinary expenses or the erection of the new structures, or otherwise, which should properly be charged to the capital account, were charged against the gross expenses, and the remainder was treated as net income. By this method it will be perceived that the amount of bonuses paid under the Cusack system was greatly reduced, and I may add that Mr. Cusack's bonus was paid on the amount of net income after deducting all other bonuses.
8. Although not referred to specifically in the bill, the complainants attempted to prove that the plants were overvalued. The company, from time to time, had valuators examine the various plants and report their estimate to the company. The values thus returned were, in good faith, accepted by the company, and entered in their books as correct appraisals. There is no evidence in the case, in the slightest degree, which tends to impugn the honesty of the company and its directors in accepting these appraisals. To support this charge, complainants offered evidence which placed the cost of construction at considerably less than that *Page 104 
paid by the Cusack Company for similar work. I think the testimony of Mr. Stauer, who was an expert in the line of billboard construction, and had knowledge of the costs, readily disposes of the charge that the Cusack Company was paying more than others for the same class of work. Mr. Stauer gave the figures of actual cost, and showed that where the cost was less it was a cheaper or inferior kind of construction. Apart from this evidence, the fact that the Cusack Company paid these prices speaks strongly against the charge. It is not contended that any member of the board of directors made any profit by such alleged excess payments, and I cannot conceive that the officers of the Cusack Company, with its splendid organization and field force attending to this work, would pay for the construction of a signboard more than what it should properly cost.
9. The ninth charge in the bill is that items were carried on the books of the company as assets, which, if properly treated, would show that the liabilities of the company greatly exceed its assets. This related to the leaseholds on which the boards are erected. Mr. Donnelly, of Boston, who says he is practically the sole owner of several concerns engaged in bill-posting, said they do not carry the leases, as such, separate and distinct from the bulletins and boards, on their books at any value. Asked the question if he knew of any others in the business who did, he said he did not know their methods of bookkeeping, and he said, "Of course they are valuable, I suppose, at that; I don't know, but I should think so." Then he says, in answer to questions, that, in effect, if a billboard is not rented then, of course, the lease becomes a liability. But it is perfectly clear that a lease is an asset, for, without it, no billboard could be placed on the land, and, without the billboard, the company could not do business, and the fact that money is made in such a business indicates that the leasehold is of value.
In the case of the Cusack Company, it has about fifteen per cent. of its location in reserve, the purpose being this — having rented space to a customer, if the lease at any time should be determined and the billboard removed, the company *Page 105 
then has other space upon which to place the advertisement. I am perfectly satisfied that this item is properly charged to assets, but, even if it were not, it would not show insolvency of the company by any means.
Having disposed of the direct charges made in the bill, I will now deal with the history and growth of the Cusack Company, and this is largely obtained from the testimony of Mr. Cusack, who was called as a witness on behalf of the complainants and examined by Mr. Lutkin. He testified that when seventeen years of age he entered into the business and is now sixty-five. He dealt on his own account until 1903, when the corporation was organized on the 1st of September of that year, under the laws of this state, with an authorized capital of $250,000. Increases were made in the capitalization, by certificates filed in the secretary of state's office, as follows: On May 20th, 1912, from $250,000 to $1,000,000; on January 24th, 1913, from $1,000,000 to $2,500,000; on April 22d 1914, from $2,500,000 to $5,000,000; on November 17th, 1917, from $5,000,000 to $10,000,000. Thus, in a period of fourteen years, the capital stock of this company was increased from $250,000 to $10,000,000.
Turning to the increase in business: prior to 1911 the property had been turned over to the American Tobacco Company. The business at that time amounted to $250,000 a year. I do not recall (and doubt if the evidence shows) when the American Tobacco Company took over the property, but it was prior to 1911. In 1917 the business had grown to upwards of $5,000,000, and increased year by year from two to four millions, until, in 1922, it exceeded $20,000,000.
Dealing with the assets: about 1912 the American Tobacco Company sold to Cusack for $250,000. The property might have been considerably more valuable, but how much more I do not think is stated; but in 1921 it was the opinion of Mr. Cusack that the physical plants were of the value of $15,000,000. He also says that the real estate purchased by the company from 1917 to 1922 had probably increased in value from two to four million dollars, and he estimated *Page 106 
the profit at about ten per cent. He says, however, that in 1917 the total business in the United States in this line was $12,000,000, and he thinks it safe to say that in the last year it amounted to $40,000,000, and, with the great increase in the business, with competition, the profits were relatively decreased. The company paid six per cent. dividends on its preferred stock regularly, and paid some cash dividends on the common stock. I do not recall at present the number of these dividends and the amounts, but it is sufficient to say that Mr. Costello, who invested $8,000 in 1912, thereafter received cash dividends of upwards of $2,800, which would be equivalent to a five per cent. cash dividends on the original investment for seven years, or from 1912 to 1919. In addition to this he received one hundred and ninety-four per cent. in stock dividends from time to time. It will therefore be perceived that the company has assets of about $15,000,000 on a $10,000,000 capitalization, and that the amount of business has been increasing at the rate of from two to four million dollars a year, and now exceed $20,000,000.
The complainants say that the books of the company do not reflect the profits and losses of the company. To illustrate: They say that in 1922 the books show a profit of $384,504.43, while the Price-Waterhouse audit shows a profit of $1,359,535.77, the difference being $975,031.34. I think this is explained inExhibit 12 of the Price-Waterhouse report, dated March 26th, 1923. I will not deal with all the items, but will point out one of $551,733.29, "cost of construction of bulletin-boards and signs, charged on books at cost of operations, reinstated on basis of inventory at December 31st, 1922." This, I take it, was a charge that should go to the capital and not to the current expense account. Adding this sum to the $384,504.43, according to the Cusack method, would make the profit $983,155.38 without examining further. The difference between this sum and the profit found by Price, Waterhouse Company, $1,359,535.77, amounting to $376,380.39, is shown in the other items, which should be properly charged to the capital and not expense account *Page 107 
The sixth charge in the bill touches the refusal of the Cusack Company to further deal with the Poster Advertising Company, George Enos Throop, Inc., and Ivan B. Nordham Company. There may also be added the O.J. Gude Company, which was controlled by Mr. Fulton. The Gude Company was in the paint sign business, like the Cusack Company. Above is pointed out the reason why the Cusack Company entered into the New York field in competition with the Gude Company. The other companies, above mentioned, were solicitors in the trade, and upon the receipt of orders for paint or posting, turned the same over to the Cusack Company (and, I presume, to others), receiving a certain percentage of profit upon the orders. The business thus turned over was in the poster and not the paint line. The amount of business received from the Fulton interests was quite large, amounting to about seven or eight hundred thousand dollars a year, and, naturally, the Cusack Company desired to retain this trade, and would not break with the Fulton interests unless for good and sufficient reasons. The reason given by Mr. Cusack for the breach is as follows: "In every instance where they solicited business and we executed it, they would go in with our card and with our authority, and then abuse and misrepresent us in every possible shape. We stood it for a long while, and finally concluded that we had to — for the protection of ourselves — that we would employ solicitors;" and he says that "in every way they misrepresented everything we had, so we concluded to stop." He says, further, that "while, as far as business was concerned, it was profitable, but as far as the reputation of the Cusack Company, and as far as the general feeling of the people that they were doing business for, it was very injurious and very unprofitable to the Cusack Company." He says, also, that this matter was discussed for some years before, and the attention of the officers of the Fulton interests was called to the fact, and they were asked to desist from their abuse of the Cusack Company, notwithstanding which the Fulton interests continued these practices; and the Cusack Company refused orders of the Fulton interests after *Page 108 
December 31st, 1920; and the question of breaking with the Fulton interests was threshed out at a full meeting of the board of directors. None of the foregoing facts were denied.
The American Poster Service, which the Cusack Company acquired from Logeman and Robbins, had a card index system containing, among other things, the names of the owners and the location of the lands where billboards were constructed, the dates of the expiration of the leases, and the amount of rent paid. Mr. Cooley says he went with the American Poster Service in 1919; that Robbins was then president and general manager and Logeman secretary; that he (Cooley) left the company's employ about a month after Cusack Company took it over; that he went to the J.R. Myers Company in the early part of 1922, at the request of Mr. Robbins, and was located in the lease department; that the Myers Company had two offices, one at 1312-14 South Wabash avenue, and the other the Washington street office, in the Andrews building, where Mr. Logeman and Mr. Robbins were. He says that in the Wabash avenue office the painting was done, and the lease men were stationed and the bookkeeping was attended to. At the Washington street office were Mr. Robbins, Mr. Logeman, Miss Gutshow and Miss Walsh. It seems that a card index system similar to that of the American Poster Service was kept at the Washington street office, and the witness went there to get instructions as to bulletin-boards, also checking the locations and as to the lease department. When he found that there was a location that they did not have at the Wabash avenue office he would go to the Washington street office, and Miss Gutshow would give him all the information that he desired on that particular location. He says: "There were quite a few locations that the American Poster Service had, and Miss Gutshow could tell off-hand how much the Cusacks were paying for the location, and if she could not remember off-hand she would go to the files and tell me." The testimony of this witness clearly indicates that, from some source, whether by a direct taking or otherwise, the J.R. Myers Company had knowledge of the contents of these *Page 109 
cards of the American Poster Service and were using them in competition with the Cusack Company. To illustrate: Having knowledge of the location, the time when a lease expired and the rent paid therefor, solicitors of the Myers Company would apply to the owner for a lease, offering a higher price, which resulted in competition which compelled the Cusack Company to pay a much higher rent for the renewal. This competition, in view of the manner in which the information was obtained by the Myers Company, was plainly unfair, to say the least.
Mr. Logeman says that he owns no stock in the J.R. Myers Company; that he is receiving no compensation therefrom; that he is looking out for the interests of his wife in that concern, in which, as I recall it, she holds one-third of the shares and Mrs. Robbins holds another one-third; that he is actively employed in the outside work of the Myers Company, supervising its construction and its locations. It seems quite clear that Mr. Logeman had knowledge of the fact that the Myers Company was using data taken from the American Poster Service cards against it; he was present a number of times when these cards were taken out, and he was the outside man on locations for the Myers Company. If this charge were untrue, it would seem that Mr. Logeman would have little difficulty in disproving it; he could have denied it with not only his own oath but with the oaths of Mr. Robbins, Miss Gutshow and Miss Walsh. Yet neither he nor the others named were called to testify to the untruth of the charge. His conduct in this respect is more reprehensible because of the fact that he was a director of the Cusack Company, occupying the position of a trustee. I am inclined to the view that Mr. Logeman's silence on the subject of such a serious charge against his business integrity stamps the story of Cooley as absolutely true.
Before dealing with Mr. Costello, I deem it proper to discuss the efforts on the part of the Fulton interests prior to Mr. Costello meeting Mr. Lutkin. In 1918 the Fulton interests sought Mr. Clabbaugh, a division superintendent of the United States department of justice, with headquarters at Chicago, *Page 110 
Illinois, to investigate the Cusack Company under the Sherman act. He met Mr. Lutkin in this same case. Prior to this time the $1,800,000 loan had been made, but had not been fully paid. Mr. Clabbaugh got in touch with the S.W. Straus Company, the persons who floated the loan, and informed them that the government was investigating the Cusack Company for a violation, he thought, of the trust laws, and suggesting that the balance unpaid be retained by the Straus Company. He says he so notified the Straus Company. Mr. Straus, an officer of the S.W. Straus Company, confirms this story, and says that they did hold up the payment, and that the Cusack Company kicked strenuously, stating "that they had obligated themselves to make certain payments, and that unless they received the money from us they knew of no other way to meet those obligations, and that they were facing, not alone a loss in not getting these companies, but also, maybe, a lawsuit, by not being able to comply with these contracts, and that Read" (the treasurer) "got quite ugly, and at the end of two or three weeks, on the advice of counsel, we paid the balance."
This was the first attempt of the Fulton interests to obstruct the Cusack Company in the carrying on of its business, so far as the record shows.
Dealing with the activities of Mr. Costello: He went into the employ of the O.J. Gude Company in 1919 as manager of the road department, or the national department, a position which brought him in direct opposition to the Cusack Company, of which he later became a director. Speaking of what led up to this suit, he said he had a talk with Mr. Fulton, who, at that time, was in the Gude Company, touching an offer to purchase his stock in the Cusack Company, and Fulton asked what it was worth, and Costello said he did not know. He was then asked by Fulton if he did not get statements of their business, and he said "no, he never thought of it;" then Mr. Fulton said, "Why don't you hire a good lawyer and get this information?" and he named Mr. Lutkin, of Chicago, whom he met two or three weeks afterward.
Touching the expense of the litigation, he said that when *Page 111 
he first made arrangement with Mr. Lutkin — "I told him it would cost a lot of mony," and he said, "We will take care of that, and if we sell your stock at a good price I expect you to make it good." Right here I may pause to state that up to the time Mr. Costello testified he had not contributed one dollar towards the expense of this litigation. The bill was filed July 17th, 1922, and has been actively litigated down to the present time. This is the third time the case has been before me; first, on a motion to enjoin the changing of the certificate of incorporation, which case was removed to the court of errors and appeals and there decided as above stated; second, on a supplemental bill to restrain a change in the form of the stock issue, which was also enjoined, and third, the present trial, in which about two thousand five hundred pages of testimony have been taken, about one thousand four hundred pages of which were taken in Pittsburg, Chicago, Detroit, Boston and New York, and about one thousand one hundred pages before me. I think it is no exaggeration to say that with the great number of counsel retained, members of the bar of this state, New York and Chicago, and the amount of time devoted to this case, and considering the character of counsel engaged and the expenses incurred up to the present time, the charges for such services and expenses would exceed the monetary value of the Costello stock, and that it is perfectly plain to my mind that Mr. Costello just loaned his name to the rivals of the Cusack Company to deal with as they saw fit in litigation to harass the Cusack Company. The first move made by Mr. Lutkin was to take advantage of the laws of the State of Illinois to procure an examination of the books and papers of the Cusack Company, not for the purpose of helping Mr. Costello, but for use by the Fulton interests in their effort to injure, or perhaps destroy, the Cusack Company.
Mr. Hummer, of the Illinois bar, who is counsel for the Cusack Company in this case, testified as to the statute on corporations in Illinois, referring to sections 38 and 84. Section 38 gives the right to each stockholder at all reasonable times, by himself or by his attorney, to examine the *Page 112 
records and books of account, and any officer or director who denies such access shall be liable to the stockholder denied in a penalty of ten per centum of the value of the stock owned by such stockholder. Section 84 deals with the restrictions and liabilities of foreign corporations. He said, under the decisions of their supreme court, particularly the appellate court of the first district, the right is held to be absolute, and that the motives and purposes of the stockholder demanding an examination are immaterial. He cites Furst v. Rawleigh Medical Co.,282 Ill. 366. He also states that, at the Illinois bar, the lawyers are divided as to whether the provisions subjecting the officers and directors to a fine, applied to foreign corporations.
Upon Mr. Lutkin being retained in September, 1921, he wrote a letter to Mr. Read, the treasurer of the Cusack Company, signing Mr. Costello's name, saying: "This letter is authority for Fraser Torbet to examine the books, records and papers of the Thomas Cusack Company, Fraser Torbet representing me as a stockholder of the company. Will you please be good enough to assist Fraser 
Torbet in obtaining the information for which they ask under my direction?" On the same date a letter was addressed to Fraser 
Torbet, signed by Mr. Costello, requesting them to make the examination, and enclosing the letter addressed to Mr. Read. Under this authorization Mr. Torbet proceeded to make the examination, and made his first report on January 15th, 1921. This report did not evidently give to Mr. Lutkin all the information he desired, accordingly, on January 22d 1921, he wrote Fraser Torbet, asking for ten items of information, the first of which is as follows: "1. Detail on outside bank loans, including names of banks, amounts of loans, maturities, c., with special information on dealings with more important banks over a period of time." The second report was furnished on January 28th, 1921, which evidently gave Mr. Lutkin the information he desired as to the banks. He thereupon called on the Harris Trust and Savings Bank, of Chicago, and saw Mr. Miche, the manager of the credit department of the bank. They had relations with the Cusack *Page 113 
Company beginning with the spring of 1920, and the company were both borrowers and depositors. Mr. Miche says: "Mr. Lutkin called to see me in the early part of February 1921, and he said he had some information to give us regarding the Thomas Cusack Company, particularly with reference to its financial condition. He said he represented the interest of certain minority stockholders, and, as one, mentioned Costello. He said an audit had been made of the company's books which showed a financial condition quite different from that shown in statements lodged with the bank." In commenting on the audit he said: "The company was in poor condition — in fact, it was going to go broke, and that, as a friend, he would advise us if we had any money due us, that we had better arrange for a rather speedy liquidation of the obligation." He used this expression, "You had better get out while the getting out is good." He said the management was not good — extravagant — that they were spending an awful lot of money for improvements, expansion and competition, all of which was unwarranted." When asked, in cross-examination, by complainants' counsel, "You did not examine, then, to find out whether the statement in the papers that Mr. Lutkin submitted to you were true or not?" He answered, "I thought the thing was so preposterous — I did not feel the necessity of doing it." He said further, "I had the statement of the auditors — the Price-Waterhouse statement — and I had gone over that whole thing very thoroughly. I was familiar with the contents of that statement both as to assets and liabilities, and particularly as to the earnings, and I felt confident our statement was a correct one."
Mr. William T. Bruckner, vice-president of the Commercial National Bank (I presume of Chicago), testified that the Cusack Company had financial relations with that bank as a borrower as well as a depositor in large amounts. In the month of February, 1921, Mr. Lutkin interviewed him. Lutkin told him that he had information that the earnings of the Cusack Company had been greatly exaggerated and that the condition was not as represented; that he was *Page 114 
representing some minority stockholders. He said, "The management was not satisfactory; they were not getting results in business; that if they owed us any money we had better look well to it and get it if we could." To the quesion, "What did you say to him?" he said, "Well, I didn't say anything. I was just listening. I suppose I expressed my confidence in the organization as I felt it." The witness made no memoranda of the figures Mr. Lutkin gave him. Asked on redirect examination why he did not take notes, he said, "Well, because I didn't consider it necessary. I carry the general import of the information. It was purely voluntary. I hadn't asked for it, and I was satisfied with my credit." He made no investigation to find out if what Mr. Lutkin said was true or not. He says, "Later, when Mr. Read came in, perhaps thirty days after that, in the regular course of business, I talked to him about it then."
Mr. F. Le Moyne Page, the secretary of the Pennsylvania Trust Company at Pittsburgh, said that Mr. Ebel (of the Fulton interests) called to see him on behalf of the Gude Company, seeking to get a contract for advertising, in competition with the Cusack Company. Mr. Ebel produced the Price-Waterhouse audit and made several comments on the statements of the Thomas Cusack Company, to the effect that they were improper for a statement upon which to apply for a basis of credit; that Mr. Ebel volunteered the opinion previously discussed to prevent the Pennsylvania Trust Company from getting tied up with the Thomas Cusack Company. He says, "The exact reason for the inadvisability of this is not recalled, but the inference is that it was owing to the fact that the Thomas Cusack Company was not a safe risk for the bank."
Mr. George F. Hurd, one of the counsel of the complainants, has been counsel for the Gude Company in some matters for about three years; has been attorney for Mr. Fulton in some matters. He was counsel for Fulton and the Gude Company in 1923 before the federal trade commission with respect to a complaint against the activities of Thomas Cusack Company, participated in preparing the complaint *Page 115 
and prosecuting it with Lutkin. His clients in this litigation were the Poster Advertising Company and the O.J. Gude Company. Mr. Fulton is president of both companies and has been for about three years. He says that Fred Ebel was connected with the Gude Company prior to December, 1923, for several years. He says that he had a talk with Harvey Gibson, president of the Liberty National Bank of New York, and Bower, one of the vice-presidents, with the idea of blocking the $6,000,000 bond issue; that he represented no one professionally in what he did, but he felt that if the Cusack Company got this money it would be poured into the Metropolitan district for the purpose of destroying the plants of Gude and Van Bueren. He says, "I also felt that any issue of securities against which a business was in a competitive condition as this outdoor advertising was at that time, would not work out well for the investors. I knew Mr. Gibson pretty well, and I like him very much, and I thought it was a bad piece of financing for the Liberty Securities Company to take hold of, and I told him so."
Mr. Joseph Bower, vice-president of the New York Trust Company, testified that in 1920 he was vice-president of the Liberty National Bank, which has since merged with the New York Trust Company; that in 1920 he had under consideration the financing of the Cusack Company; that he had a visit from Mr. Hurd; he did not know him before; that Mr. Hurd came by appointment and desired to know the nature of the financing for the Cusack Company. Mr. Bower said he was not at liberty to discuss it; that Mr. Hurd said he was anxious to know because he was interested in it as counsel for a company that was a competitor of Cusack. The statements made by Hurd to the witness were detrimental to the Cusack Company.
At this point I may add that Mr. Cusack said that the object of making the $6,000,000 loan "was not for expansion, but to pay dividends and have the company continue to pay dividends and not to expand, in the condition of the business, but to hold its own." *Page 116 
Mr. Hurd says that the bill in this cause was prepared by Mr. Lutkin.
Mr. Lutkin was called and testified on behalf of the defendants, and he says he has represented the Poster Advertising Company since its formation in 1917 in various matters. He testified that some time in 1918 he submitted a brief on the law and the facts on behalf of the Poster Advertising Company to the United States attorney for the district of Illinois, and also Mr. Clabbaugh of the federal service, looking toward the indictment and likewise the prosecution of the Thomas Cusack Company by civil proceedings under the Sherman act for violations of the Antitrust law. He said that he and his partner prepared a bill, the purpose being to enjoin the $6,000,000 financing of the Thomas Cusack Company when the same was under discussion. Mr. Costello was to be the complainant in the action. He says he drew most of the present bill coming out on the train, and that there was not much time to get the original injunction before the meeting was called. Annexed to this bill is the affidavit of Mr. Costello verifying the same. This affidavit undoubtedly was prepared in accordance with the frame of the bill. Costello did not see the bill and affidavit until he was called upon to swear to the affidavit. The affidavit is not sworn to on information and belief, but in positive terms; and, being confronted with his affidavit, and asked what knowledge he had of the facts contained therein, in a great many instances which touched very important and vital matters, he admitted that he did not know the facts of his own knowledge, and, generally, said he got the information from Mr. Lutkin; and, in other cases, he said he did not know where he got the information from.
In the taking of the depositions out of court, the defendants undertook to take the testimony of Messrs. Fulton, Lutkin, Logeman and Robbins. On the advice of counsel they refused to testify, on the ground that there was no authority, under the commission, to take their depositions, and that they would be produced in court as witnesses on the trial of the cause. Whether they were produced (with the exception of *Page 117 
Mr. Lutkin) I am not aware. Mr. Lutkin was called, as stated above, by the defendants, to testify, but did not deny any of the statements and conduct above ascribed to him. None of the others named were sworn on either side, excepting that Mr. Logeman's testimony was taken in open court on the original order to show cause, which testimony, under stipulation of counsel, is to be considered in the case.
A great deal of the testimony taken out of court was purely hearsay, and in considering this case it has been ignored.
(I omitted to state in the early part of this memorandum that Mr. Walker, who is the president of Walker Company, outdoor advertisers, and has been actively engaged in the business for twenty-eight years, in his testimony, taken in Detroit, says that most of the plants throughout the United States are putting all earnings back into expansion.)
It is perfectly plain, on the whole case, that Mr. Costello, in bringing this suit, has loaned himself as a tool to the rival interests, the purpose of which he must know (if he knows anything) is intended to injure, if not to destroy, the business of the Thomas Cusack Company.
Being of the opinion that the affairs of the Thomas Cusack Company have been operated at a profit, and that its business has been wisely and honestly managed in the interests of the stockholders and creditors, and that the complainants have not, in the slightest degree, shown aught to the contrary, I would advise a decree dismissing the bill, were it not for the fact that the complainants prevailed on another branch of the bill, namely, that which refers to the amendment of the certificate of incorporation; the decree, however, will be in favor of the defendants on all the issues litigated before me on final hearing; and as to what decree shall be made with respect to the attempt to change the certificate of incorporation, where the injunction issued and the decree of this court was affirmed by the court of errors and appeals, and also what decree shall be made with respect to the order making the order to show cause absolute, on the supplemental bill, which touched the change in the character *Page 118 
of the stock, may be settled on the signing of the final decree, after the determination of the counter-claim filed by the defendants, which, by common consent, was to be argued after a decision on the main case.
The defendants, as a further defense, ask that the bill be dismissed because the complainants do not come into equity with clean hands, and cite Prindiville v. Johnson et al., 93 N.J. Eq. 425,
to sustain their position. In that case Chief-Justice Gummere, speaking for the court of errors and appeals, said:
"We are unwilling to consider the meritorious questions decided by the vice-chancellor. The complainant, according to the averments of his bill and the undisputed facts set out in the answer and developed by the proofs, came into the court of chancery for the purpose of having it there declared that a scheme, in the execution of which he was an active participant and the recipient of very large sums of money, was a fraud upon our statute, a violation of our public policy, and, therefore, null and void, and sought to have an adjudication in his favor, based upon these facts, in order that he may now enjoy benefits which can only come to him as a result of such an adjudication. Stated shortly, his position is this: Having for some eight years participated in the carrying out of this fraudulent scheme and reaped the benefits thereof, he now seeks, either for his own personal benefit or as the self-constituted representative of the state, to have this fraudulent scheme ended and our state laws and policies vindicated."
In that case it will be perceived that the bill was filed attacking the very scheme to which the complainant was a party, and seeking to have it declared null and void, the complainant expecting to benefit thereform.
In the case of Howe v. Chmielinski et al., 237 Mass. 532;130 N.E. Rep. 56, Mr. Justice Braley, in the supreme judicial court of Massachusetts, said:
"A plaintiff who has engaged in inequitable conduct, having an immediate and necessary relation to the matter for which he seeks relief, will not be aided by a court of equity, *Page 119 
and it is wholly immaterial in the case at bar that the defendant, also an undisclosed participant, has not been harmed, but generally benefited."
In Woodward v. Woodward, 41 N.J. Eq. 224, citing Pomeroy, Vice-Chancellor Van Fleet said:
"The iniquity which deprives a suitor of a right to justice in a court of equity is not general iniquitous conduct unconnected with the act of the defendant, which the complaining party states as his ground or cause of action, but it must be evil practice or wrongful conduct in the particular matter or transaction in respect to which judicial protection or redress is sought."
The doctrine of this latter case was approved in the court of errors and appeals in Munn v. Americana Co., 83 N.J. Eq. 309,
where Mr. Justice Swayze said:
"We think, therefore, that the decree must be reversed, but it does not follow that the complainant is not entitled to some of the relief granted. The disqualification applies only to the particular matter or transaction with which the wrongful conduct had to do."
Applying these principles to the instant case, the first question to be determined is, What relation the misconduct above set forth bears to the relief sought by this bill? The misconduct above set forth displays a motive to injure the defendant company in its business for the benefit of a rival. The relief sought by the bill, among other things, is to have it adjudicated that the defendant company has been mismanaged, with a prayer for an injunction and receiver. This bill is filed by stockholders. In the case of Bull v. International Power Co., 84 N.J. Eq. 6,
Chancellor Walker said (at p. 10):
"It is quite universally held that when a suitor is entitled to relief in respect to the matters concerning which he sues, his motives are immaterial (citing cases)." He said, further, "The complainant's motives here are quite immaterial. They have an absolute statutory right to maintain their bill, and if they make a case under the statute they are entitled to the relief they seek." *Page 120 
This case was affirmed unanimously by the court of errors and appeals in 85 N.J. Eq. 206.
There are numerous other cases in this state to the same effect which are unnecessary to cite, as the principle is quite clear. The only question is the application of the principle to the present case, and, as I see it, the conduct of the complainants has no relation to their rights as stockholders. They are not claiming relief with respect to the things condemned; they are simply asserting that the company is mismanaged, and praying for an injunction and receiver, and this right they may assert, notwithstanding the above misconduct, the same as any other stockholder. My opinion, therefore, is that the doctrine of unclean hands is not applicable in the present case, and a decree will be advised accordingly.